NOTICE

Decision filed 03/19/10, corrected 04/07/10. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

NO. 5-07-0568

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| JERRY DOBYNS, as Special Administrator of the Estate of Angela Dobyns, Deceased, | ) ) ) | Appeal from the Circuit Court of Randolph County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 05-L-33 |
| DAVID CHUNG, M.D., and SPARTA COMMUNITY HOSPITAL, | ) ) ) | Honorable Richard A. Brown, |
| Defendants-Appellees. | ) | Judge, presiding. |

_____

JUSTICE SPOMER delivered the opinion of the court:

The plaintiff, Jerry (Jay) Dobyns, as the special administrator of the estate of Angela (Angie) Dobyns, deceased, appeals the order of the circuit court of Randolph County that entered a judgment on a jury verdict in the plaintiff's favor in the amount of $100,000, reduced by 50% according to a finding of contributory negligence on the part of the deceased. The plaintiff asks this court to reverse the judgment and remand with directions that the circuit court grant the plaintiff's motion for an *additur* or, in the alternative, a new trial solely on the issue of damages or a new trial on all the issues. The issues on appeal are as follows: (1) whether the damages awarded by the jury are manifestly inadequate and contrary to the evidence, (2) whether the circuit court erred in barring Abiodun Sangoseni, M.D., from testifying about whether the long-term prescription of narcotics is appropriate, and (3) whether the circuit court erred in refusing to admit the plaintiff's drug summary into evidence. For the reasons that follow, we affirm.

1

FACTS

On March 23, 2007, the plaintiff filed a second amended complaint in the circuit court of Randolph County against the defendants, David Chung, M.D., and Sparta Community Hospital, seeking damages pursuant to the Wrongful Death Act (the Act) (740 ILCS 180/0.01 *et seq.* (West 2004)). The complaint alleged that Angie was under the care and treatment of Dr. Chung from 2001 through May 2004. On May 28 and 29, 2004, Angie sought care and treatment at Sparta Community Hospital and was also treated by Dr. Chung at that time. According to the complaint, Dr. Chung was negligent in failing to properly evaluate and treat Angie's pain syndrome, prescribing inappropriate types and amounts of pain and other medications, and failing to provide adequate information and warnings regarding the prescribed medications and the risk of potential harm from taking those medications concomitantly.

During a lengthy jury trial that commenced on March 27, 2007, Dr. Chung testified that Angie first came to him on October 22, 2001, complaining of severe stabbing pains. Angie was 32 years old at the time and had previously been diagnosed with a bulging disc in her back and had a history of pain in her back, leg, and abdomen. She had suffered from back pain since 1992. Dr. Chung testified that there was nothing to indicate that Angie's pain was interfering with her ability to do household chores and care for her children. Dr. Chung testified that when Angie first came to him for treatment, she was employed at a local hotel as a housekeeper. She informed Dr. Chung that her pain was interfering with her work. It was Dr. Chung's belief that she was unable to do housekeeping chores in an employment capacity but that she could manage those chores in her home. Dr. Chung testified that when Angie first sought treatment from him, she was not on any narcotics but was using over-the-counter treatments such as Tylenol and ibuprofen. At that time, Dr. Chung wrote Angie a prescription for 30 Percocet, five-milligram tablets, at a dosage of one

2

to two every four to six hours as needed. Dr. Chung testified that he referred Angie to a neurosurgeon and to an endocrinologist in 2002 but that she never saw either specialist.

Dr. Chung continued treating Angie with Percocet for the majority of the following 2½ years. On one occasion during that time, Dr. Chung took Angie off the Percocet and prescribed fentanyl, a long-acting narcotic to which Angie developed a reaction. Subsequently, Dr. Chung discontinued all narcotics for 10 days. On two other occasions during the 2½-year treatment period, Dr. Chung again discontinued the Percocet and prescribed Oxycontin, a long-acting version of oxycodone, which is the same narcotic that is in Percocet, and MS Contin, a long-acting version of a morphine sulfate. Angie did not respond well to these, so Dr. Chung discontinued them and put her back on Percocet. During the same time frame, Dr. Chung prescribed for Angie amitriptyline and nortriptyline, both of which are adjuncts for pain medication. He also prescribed for Angie Vioxx, which is a nonsteroidal anti-inflammatory, Percodan, Phenergan with codeine to be used as a cough suppressant, and Skelaxin and Flexeril, both of which are muscle relaxants to address pain. Dr. Chung was aware that Angie was concurrently on medications prescribed by other physicians, including Darvocet and Lorcet, which are also narcotics which contain hydrocodone, as well as Tylenol.

In spite of all the narcotics Angie used, she continued to suffer from pain in her back, abdomen, hip, and knees. Dr. Chung confirmed that Angie had 47 office visits and 27 emergency room (ER) visits during the 2½ years he treated her. Dr. Chung testified that the purpose of the office visits was to assess the efficacy of Angie's medications and to refill her prescriptions. Dr. Chung reported that he never saw any signs of oversedation or somnolence during the office visits. Many of the ER visits were for pain treatment in addition to that which Dr. Chung had prescribed, and other visits were for reasons unrelated to her chronic pain. According to Dr. Chung, in spite of the multiple ER visits, he believed

3

that Angie's pain was generally controlled to the point of allowing her to function.

Dr. Chung testified that taking Demerol by intravenous injection is approximately three times more potent than taking it orally. Angie received 300 milligrams of Demerol by intravenous injection during her hospitalization from the late afternoon of May 28, 2004, until the morning of May 29, 2004. Dr. Chung stated that this was comparable to giving Angie 900 milligrams, or 18 pills, of Demerol in this amount of time. In spite of this level of medication, nowhere in the medical records did it state that Angie was in a stupor or suffering from somnolence. Dr. Chung testified that this level of Demerol may put a person who has never been on narcotics in a coma, but if someone is already on narcotics, that person's tolerance may result in an absence of any physical indications of being on narcotics. The Demerol helped alleviate Angie's pain to a degree but did not give her 100% relief. After the Demerol intravenous injection, Angie still rated her pain as 5 or 6 out of 10, in comparison to the 10 out of 10 when she first arrived at the hospital. Nevertheless, Angie was able to walk in the halls, laugh, smile, eat, drink, and converse normally. Her vital signs were also stable. Dr. Chung's discharge notation from the hospital says, "[Right lower quadrant] pain of unclear etiology," meaning that Dr. Chung was not entirely sure of the cause of Angie's pain. He denoted chronic pain as a secondary diagnosis and planned a consultation with a gastroenterologist.

Dr. Chung confirmed that narcotics are addictive and that a patient must be monitored to avoid the potential of abuse. Dr. Chung testified that he monitored Angie during her 2½ years of treatment and never felt like she was abusing the medications. Dr. Chung provided information regarding the five medications he prescribed to Angie after her hospitalization in May 2004, in addition to the Demerol prescription, and acknowledged that all the medications were central nervous system (CNS) depressants. Dr. Chung had familiarized himself with the Physicians' Desk Reference (PDR) warnings for each of the drugs he

prescribed and their increased risk of producing additive CNS depressant effects when coadministered with other CNS depressants. Other warnings included the potential for respiratory depression and, to a lesser degree, circulatory depression, respiratory arrest, shock, and cardiac arrest.

Dr. Chung testified that he heeded the PDR warnings and was cautious with Angie's prescriptions. When Angie was discharged from the hospital on May 29, 2004, Dr. Chung noted no signs of toxicity and her clinical evaluation posed no concerns. At that time, he reduced Angie's Percocet prescription to one tablet every four hours as needed, from the usual dose of one to two tablets every four to six hours as needed. This reduction was in part because Dr. Chung added Demerol to Angie's medicine regimen. Dr. Chung also reduced the Effexor from 225 milligrams to 75 milligrams once per day and reduced the Neurontin from 900 milligrams three times a day to 600 milligrams twice a day because he was not seeing a good response from it and he wanted to avoid toxicity. Dr. Chung testified that upon Angie's May 29, 2004, discharge he prescribed, *inter alia*, Demerol as a short-term pain medication and Percocet as a long-term pain medication. Dr. Chung admitted that had he just given the Demerol and held the Percocet until she was done with the Demerol, that would have avoided the possibility of the additive effects of giving them concurrently.

In conclusion, Dr. Chung testified that he followed up with Angie after each ER visit, attempted to determine the source of her pain, and made appropriate adjustments to or refilled her current medications. The transcript of Dr. Chung's deposition of March 2, 2006, was then read to the jury, wherein Dr. Chung agreed that Angie's death was caused by respiratory arrest. He opined that the combination of the drugs in her system had contributed to her death, but he noted his belief that she had taken more than the prescribed dosage.

After the plaintiff's expert witnesses gave extensive testimony and concluded that Dr. Chung had breached the standard of care, Bob Ulianich testified that Angie was his

5

stepdaughter but that he had considered her as his own daughter. Bob married Angie's mother when Angie was two years old, and he helped raise Angie. Bob testified that Angie married Robert Brosch when she was 18 years old. A couple of years later they had a son, Robbie, followed by another son, Chris, 3½ years later. At that time, Angie and Robert's marriage was stormy. They divorced shortly after Chris was born. A couple of years after the divorce, Angie married Jay Dobyns. Bob spent significant amounts of time with Angie, Jay, and the boys. He testified that their family was always together and got along very well. Jay was the only father the boys ever knew, because their biological father was not a part of their lives after he and Angie divorced. Jay took the boys hunting and fishing and called them his own, just as Bob had done with Angie. Bob reported that Angie and Jay got along well and had a good marriage. Angie worked a little bit outside the home but was a homemaker for the most part, staying at home and taking care of the boys. Bob testified that Angie was a wonderful mother. She was involved in the boys' school and sports, took them to the park, and spent time reading and coloring with them.

Bob was aware that Angie had back pain in the several years prior to her death. Bob testified that in spite of the pain, Angie still did her daily activities, like taking care of the boys and doing household chores. Bob knew that Angie was on medication for her back, but he did not know what type of medication. When Angie and her family visited with Bob, she brought her medicine with her, and Bob occasionally observed her taking the medication. It was Bob's experience that Angie was very conscientious about her medicine. Bob testified that Angie only took that which was prescribed to her and was always very punctual in taking it. She refused to take the medicine even half an hour early. However, Bob was unaware of what the dosage was on the medications.

Bob testified that after their stay at Jay's parents' home, Angie and her family planned to visit Bob and his wife on May 30, 2004. However, at around 4:50 a.m. that day, Angie's

6

oldest son, Robbie, called Bob on the telephone, repeating that his mother was dead. Bob and his wife and son went directly to the hospital. When they arrived, Angie had already been pronounced dead. The boys were in tears and it was difficult for Bob to comfort them. After Angie's funeral, the boys went to Bob's home and stayed for the summer. When school started, the boys had to move in with their biological father, Robert Brosch. Bob reported that the boys did not adjust well to the new living arrangements because they remembered all the times Robert was not there for them. They wanted to continue living with Bob and his wife, but Robert would not allow it, which only built more resentment. However, that improved with time. Bob did not characterize the boys' relationship with Robert as "good," but things were livable and they were getting along fine. Bob testified that he and the boys live only 15 minutes apart and that he continues to see them on a regular basis but that they had not been the same since Angie died. Bob described them as withdrawn and unhappy. At the time of the trial Robbie was 18 years old and Chris was 14. Bob noted that Robbie talks about his mother but that Chris holds it all in. Anytime Bob offered to talk to Chris, he replied that he did not want to talk.

Bob testified that Jay moved in with him and his wife after Angie's death so he could be closer to the boys. Jay stayed there for approximately a year and a half. Bob observed that, like the boys, Jay was not the same after Angie died. He moped around and no longer laughed or joked as he used to. Bob explained that when they lost Angie, they lost everything. To the best of Bob's knowledge, the boys and Jay were still in communication.

Jay Dobyns testified that he is 31 years old. Shortly after he met Angie, he met Robbie and Chris and they all got along well from the very beginning. At that time, Robbie was five years old and Chris was two. After Jay and Angie married, Jay considered Robbie and Chris to be his own boys. Jay testified that he, Angie, and the boys were a close family and did everything together. When Angie's parents bought a camper, Jay, Angie, and the

7

boys camped almost every weekend. They enjoyed fishing, cooking out, and swimming. They also went to the zoo, amusement parks, and playgrounds. Jay described Angie as an excellent mother. Her whole life revolved around the boys. She called Robbie her pride and Chris her joy. She was always involved in sports the boys participated in, as well as all the school functions they were a part of.

Jay reported that he and Angie had a very healthy marital relationship. He acknowledged that there were times when Angie's pain interfered with their sexual relations. However, they seldom had arguments and decided early in their relationship to never go to sleep while angry. Jay described Angie as a stay-at-home mother. This was Jay's decision because he had been brought up in a traditional household. Angie had previously worked part-time as a housekeeper for a company, but she did not work at all for the last four or five years of her life because her back problems prevented her from being on her feet for very long. Accordingly, Jay went to work while Angie took care of the kids and did the household chores. During their marriage, Jay was aware that Angie had problems with her back. Angie had mentioned it to Jay very early in the relationship, but she never complained about it for the first couple of years. However, as time progressed, so did the pain. By the late 90s, Angie was complaining more about her back pain. She also had leg pain that was incidental to her back condition. Jay testified that Angie still did the household chores, although it took her longer than before. When the pain was significant enough to prevent Angie from doing certain tasks, Jay and the boys helped her. Jay testified that for the most part, however, Angie did most of the chores and continued doing so until the day she died.

When Angie started treating with Dr. Chung in October 2001, Jay had no knowledge of her taking any narcotics or other pain medications for long periods of time. She had only occasional prescriptions for back pain. After seeing Dr. Chung, however, Angie was on some type of pain medication for the rest of her life. Jay verified that Angie saw Dr. Chung

8

very regularly. He accompanied her to only a few of the visits. Jay knew that Angie took medications consistently. He was aware that Angie was taking Percocet but did not know the other medications Dr. Chung had prescribed, nor was he familiar with the dosages of the medications. Jay mostly worked the first and second shifts, so the only time he observed Angie taking any medicine was at night, when he spent most of his time with her.

Jay was convinced that Angie's pain was real and that her medication helped her somewhat, although the medication never actually took the pain away because she still complained of pain after taking her medicine. Jay testified, however, that the medication helped Angie to do activities around the house and to interact with him and the boys. Jay denied that Angie was depressed. To the contrary, Jay described Angie as outgoing and happy. Jay conceded, however, that Angie was apparently hiding her depression from him, because prior to the trial he was unaware that Dr. Chung had prescribed her medication for depression.

Jay never saw Angie take excessive amounts of any medication. He was adamant that Angie was very conscientious about her medication and always took the prescribed amounts. Jay did not believe that Angie was overly dependent on her medications. He admitted, however, that he had never received any type of training regarding drug dependence. He testified that Angie typically kept her medication in her purse and took it with her when she left the house. In spite of the medications, Angie frequented the ER due to excessive pain. Jay accompanied Angie to the ER several times. On May 27, 2004, Jay got off work at 11 p.m. and took Angie to the ER at around 12 midnight. When they returned home, Angie went to sleep. Later that day, Angie's pain returned, so Jay again accompanied her to the ER. Jay stayed with Angie about an hour and then left at about 2 p.m. to go to work. He arranged for his sister to pick Angie up when she was released, but she was admitted to the hospital. Jay spoke with Angie on the telephone at around midnight on May 29, 2004, when

9

he got home from work. She was complaining of stomach pain. Tests had been conducted, the results of which would be known later in the morning. Jay returned to the hospital at 8 a.m., and Angie was released at around 1 p.m. Jay testified that Angie was given prescriptions for Demerol and Percocet.

After picking up the prescriptions, Jay, Angie, and the boys went to Jay's parents' home for Memorial Day weekend. Angie did not complain of pain during the hour-and-15-minute car ride. Jay did not see Angie take any medication while in the car. Jay testified that Angie was interacting and seemed awake and alert. However, after arriving at Jay's parents' house, Angie complained about having nausea and stomach pain a couple of times. Jay testified that he did not see Angie take any medication while at his parents' house. However, Jay noted that he spent most of the evening visiting with the guys and playing cards. He went to bed at around 11 p.m. Angie was still up, sitting at the kitchen table visiting with Jay's mother and sister. Jay did not know what time Angie came to bed. He woke around 5 a.m. because he had plans to go fishing. After Jay got out of bed, he got dressed and made a cup of coffee. He then decided to check on Angie because she usually woke and got out of bed when he did. When he got to Angie, she was completely unresponsive. Jay screamed for his father, who grabbed the telephone. Jay's sister's boyfriend entered the room and began performing CPR. Subsequently, an ambulance arrived and took Angie to the hospital. Jay, his father, and the boys followed the ambulance. Upon his arrival at the ER, Jay was informed that Angie had passed away and that it was too late to save her life. Jay consented to an autopsy.

Jay confirmed that, following Angie's death, he and the boys moved in with Angie's father and mother, Bob and Donna. At summer's end, the boys went to live with their biological father, but they still saw Jay every weekend. Jay corroborated Bob's testimony that the boys were just not themselves after Angie died. They would not interact. Jay

10

eventually moved to Arkansas because there were more job opportunities and he needed a change. He still communicates with the boys and misses them and Angie. Jay testified that he still thinks about Angie every day.

Jerry David Dobyns testified that he is Jay's father. He confirmed that Jay and Angie got along very well, that Angie's boys considered Jay to be their father, and that they all functioned as a normal family. Jerry testified that on the afternoon of May 29, 2004, when he got home from work at around 3 p.m. Jay, Angie, and the boys were already there. His youngest daughter and her fiancé were also there. The guys were outside barbecuing and the ladies spent the evening inside, so Jerry did not discuss with Angie how she was feeling. From what Jerry saw of Angie, she was interacting, laughing, and talking. She did not seem to be under the effects of any type of medication, nor did Jerry observe Angie take any medication throughout the evening.

Jerry went to bed at around 9:30 p.m. He woke Jay at 5 a.m. the next morning. After Jay came out for coffee, Jay went back to his bedroom and yelled for Jerry. Upon entering the room Jerry observed that Angie's complexion was gray. Jerry corroborated Jay's testimony regarding the events that followed. After the ambulance took Angie, Jerry did not find any pills anywhere in the house. He confirmed that his wife, Terry, had retrieved Angie's medicine from her purse. Jerry testified that Jay and the boys were devastated when they found out that Angie was dead.

Terry Dobyns testified that she is Jay's mother. She visited with Jay, Angie, and the boys regularly, and the boys call her "grandma." Terry was not aware of any marital problems between Jay and Angie. She testified that both Jay and Angie had a good relationship with the boys. Terry was aware that Angie had back problems. She stated that Angie sometimes had difficulty doing chores such as vacuuming. When this occurred, Angie sat down awhile and then continued. Angie never discussed any of her medications

11

with Terry, nor had Terry ever seen Angie take her medication.

Terry testified that on the evening of May 29, 2004, Angie had a good time, ate normally, never complained about any pain, and did not appear to be under the influence of medications. Terry went to bed between 1 a.m. and 2 a.m. on May 30, 2004. Angie was still up. Terry was unsure what time Angie actually went to bed. Terry testified that she woke when her husband's alarm clock went off. She was starting to go back to sleep when she heard Jay hollering. He was begging Angie to get up. By that time, Chris, Angie's youngest boy, was in the room with Jay and Angie. Terry made Chris leave the room.

Robert (Robbie) Brosch, Jr., testified that he is Angie's oldest son. At the time of the trial Robbie was 18 years old. He testified that he thinks about his mother every day. He described life with Angie as great and reported that the years were good when Angie and Jay were married. The family participated in many outdoor activities together, and Robbie was very happy during that time. As a stay-at-home mother, Angie woke Robbie up in the morning, made his breakfast, took him to school, and helped him with his homework. Robbie testified that Jay and Angie got along well and that he saw Jay as his father. Before Angie passed away, Robbie did not have much of a relationship with his biological father because he only saw him three or four times per year.

Robbie testified that things were not good since Angie passed away. After moving out of his grandparents' home, Robbie and his brother moved in with their biological father. In doing so, Robbie had to change schools. Robbie reported that the arrangement was tough in the beginning. He testified that his father yelled at them and tried to hit and choke Robbie's brother. Robbie's stepmother did not do the things for him that Angie did. Things improved a little over time, but Robbie misses everything about Angie. He carries her picture in his wallet and has a room at his grandparents' home where he keeps many of Angie's personal possessions. Most of all, Robbie misses the way she put him first.

12

Christopher (Chris) Brosch also testified. At the time of his testimony he was 14 years old and in the eighth grade. He turned 12 just a couple of days after Angie died. Chris testified that when Angie was alive, she was very active in school events and went to all of his sports games, including baseball, football, and soccer. Angie also took Chris to practices. Chris enjoyed camping with Angie, Jay, and Robbie. Chris looked to Jay as a father and Jay treated him well. Chris never saw Jay and Angie fighting or yelling at each other. He reported that they got along well. Chris testified that since Angie's death, it has been hard for him to think about her, so he does not talk much about her. Chris corroborated Robbie's testimony about life with their biological father and stepmother. He reported that they still did not get along well but that it was better than it had been in the beginning. Chris testified that his life is very different now than before. He does not go camping or fishing like he used to. Chris misses Angie's love more than anything.

Dr. Mary Case testified that she is a pathologist who serves as the chief medical examiner of St. Louis County, as well as three other counties. She is also a professor of pathology at St. Louis University. After a lengthy review of her curriculum vitae, Dr. Case testified that she had reviewed Angie's medical records from about 2001 through the date of her death, including hospital, ER, and physician records. She had also reviewed the autopsy report and slides, the toxicology report, records from the emergency personnel who transported Angie to the hospital on the date of her death, and the depositions in the case.

Dr. Case opined to a reasonable degree of medical and pathological certainty that the cause of Angie's death was acute intoxication with multiple medications, consisting primarily of Percocet, Neurontin, Effexor, Phenergan, and Demerol. Dr. Case opined that the acute intoxication was caused by Angie taking more medication than she should have. Dr. Case elaborated that there was too much medication, which shut down Angie's nervous system. She explained that the above five medications exceeded the therapeutic level,

13

although none were at a lethal level. Percocet and Demerol were the most significantly elevated medications in Angie's system, although Dr. Case admitted on cross-examination that the elevated levels of all the drugs in Angie's system contributed to her death.

Dr. Case testified that Dr. Heidingsfelder performed Angie's autopsy on May 30, 2004, at 5 p.m. According to Dr. Case, Dr. Heidingsfelder performed the autopsy in the usual, routine, competent manner. Everything was well-documented and acceptable. Dr. Heidingsfelder found the presence of pulmonary edema, which is fluid in the lungs. This was a nonspecific finding commonly associated with respiratory depression. Dr. Case testified that very obese people may have respiratory difficulties and are more susceptible to respiratory depression. However, while Dr. Case considered Angie to be a large lady, she never classified her as excessively obese, although she had not calculated Angie's body mass index. Dr. Case reiterated that the coroner discovered seven Percocet pills missing and eight Demerol pills missing from the prescription bottles which had been filled the day before. If Angie had taken the pills as prescribed, she would have taken six Demerol and four Percocet. Dr. Case confirmed that the number of missing pills was consistent with the supertherapeutic levels found in Angie's body.

At the conclusion of Dr. Case's testimony, the videotaped evidence deposition of Dr. Srinivas Chilakamarri, conducted on March 7, 2007, was played for the jury, wherein Dr. Chilakamarri testified that he is a psychiatrist practicing at St. Anthony's Medical Center. Dr. Chilakamarri had the occasion to examine and treat Angie's youngest son, Chris, beginning on November 1, 2005. Chris had been seeing a therapist, Diane Gawedzinski, because he was having problems at home, at school, and in his personal life. Gawedzinski referred Chris to Dr. Chilakamarri because the therapy sessions had been fruitless. Dr. Chilakamarri reported that Chris was depressed, belligerent with his teachers, failing classes, fighting in school, exhibiting out-of-control behavior at home, and unable to get along with

14

his father and stepmother. None of these behaviors were present prior to Angie's death.

Dr. Chilakamarri described Chris as withdrawn and diagnosed him with major depression that was complicated by pathological grief. Dr. Chilakamarri explained that Chris's grief was pathological because he was not adjusting to the loss. Chris was also diagnosed with a personal crisis and a family crisis, meaning that he had lost his mother, whom he was very close to, and had moved in with his father and stepmother and was not happy. Chris also had a previous diagnosis of attention deficit disorder (ADD). Dr. Chilakamarri was unsure whether the diagnosis of ADD was given before or after Angie's death. Dr. Chilakamarri suggested that Chris attend a four-hour group therapy session and prescribed him medication to treat the depression. Dr. Chilakamarri learned in follow-up appointments that Chris was responding better to the counselors. Chris was released from Dr. Chilakamarri's care in mid-November 2005, with instructions to follow up with him for medication management. It was also suggested that Chris receive family counseling. Dr. Chilakamarri had not seen Chris since and was unaware of his status.

Dr. Chilakamarri opined that had Angie not died, Chris would not have had the problems he was having. Although Chris had other stressors in his life such as moving in with his father and stepmother and not getting along with them, changing schools, and failing classes, all of those were a result of Angie's death. Dr. Chilakamarri added that if there was not enough support for Chris to treat his depression and grief, he would have an increased risk of alcohol and substance abuse later in life. Dr. Chilakamarri conceded on cross-examination that he was not sure whether Chris was receiving that support.

Subsequent to the presentation of the videotape, the court took judicial notice of the National Vital Statistics Report regarding life tables issued by the United States Department of Health and Human Services, which references life expectancies of individuals in the United States. Pursuant to the report, a female aged 34 to 35 years of age, which was

15

Angie's age at the time of her death, is expected to live an additional 47.3 years. Regarding Angie's sons, the statistics show that the life expectancy is an additional 61.6 years for a male of Chris's age and an additional 57.7 years for a male of Robbie's age. Further, Jay Dobyns was expected to live an additional 45.6 years.

Dr. James Gibbons, an anesthesiologist and pain-medicine specialist, testified that he reviewed all the pertinent materials in the instant case and concluded that Angie would be appropriately considered a chronic-pain patient because over a long period of time she suffered from numerous pains which were hard to manage. Dr. Gibbons testified that it was reasonable for Dr. Chung to prescribe Percocet for Angie on her first visit to him in October 2001 because she was having an uncontrolled pain problem. However, Dr. Gibbons acknowledged on cross-examination that Angie had suffered from back problems for 9½ years prior to coming to Dr. Chung and had never been on long-term narcotics during that time and yet was able to function. Dr. Gibbons testified that after Angie's initial visit to Dr. Chung, she had frequent visits to the ER due to breakthrough episodes of pain, a phenomenon which is very common among chronic-pain patients. Dr. Gibbons explained that pain has a constant component but may have breakthrough episodes which are not controlled by the baseline level of pain medication given.

Dr. Roger Wujek testified that he is a family practice physician and had been for more than 27 years. He testified that pain management is very integral to family practice and that it is common for family practitioners to manage chronic-pain patients over long periods of time. This entailed the use of various forms of pain medications, including narcotics such as Demerol and Percocet. Dr. Wujek testified that a goal of pain management is to keep the patient functional in his or her everyday life. He noted that the end result of pain management is to attempt to find the cause of the pain and eliminate the cause if possible. Dr. Wujek reviewed Angie's medical and ER records, as well as the depositions in the case,

16

and opined to a reasonable degree of medical certainty that Dr. Chung met the standard of care of a family practitioner in the treatment he provided Angie.

Dr. Wujek testified that Dr. Chung started Angie off with a small dose and cautiously added one medication at a time. He noted that Dr. Chung always wrote out the number of pills on the prescriptions to prevent alterations. He saw Angie on a regular basis and dealt with all of her problems. Dr. Wujek added that Dr. Chung attempted to involve a number of consultants, although Angie did not always follow through with the recommendations. Moreover, Dr. Chung attempted several times to put Angie on less-addictive medications, most of which were unsuccessful. However, Dr. Wujek saw no signs of addiction from Angie, with the exception of a note on her records that she requested an early refill on a prescription one time. Other than that, there were no symptoms of physical withdrawal, and she always had her prescriptions filled on time. Dr. Wujek noted that there were signs of tolerance, however. Angie would see Dr. Chung after being on a particular dosage of medication and complain that she was still having pain, which necessitated increasing the dosage and resulted in a number of pills prescribed each month which did not provide adequate pain relief.

Dr. Wujek testified that when patients are being treated for chronic pain, it is common for them to have breakthrough pain, requiring trips to the ER. Regarding Angie's hospital discharge on May 29, 2004, Dr. Wujek opined that the prescriptions written upon her release were entirely appropriate because Dr. Chung was treating a variety of conditions. Phenergan was prescribed for nausea; Soma for muscle pain; Neurontin for neuropathic pain; Effexor for depression; Xanax for anxiety, which is often associated with depression; and Percocet and Demerol for pain relief. Although Dr. Wujek admitted that Angie probably suffered from sleep apnea because of her weight, he nonetheless opined that she died from oversedation rather than respiratory center depression. Dr. Wujek opined to a reasonable

17

degree of medical certainty that had Angie taken the Demerol and Percocet as prescribed by Dr. Chung, she would not have died.

At the conclusion of deliberations, the jury found in favor of the plaintiff and against the defendants. The jury also found the following: (1) without taking into consideration the question of a reduction of damages due to the negligence of Angela Dobyns, the total amount of damages suffered by the plaintiff as a proximate result of the occurrence in question is $100,000, (2) assuming that 100% represents the total combined negligence of all persons whose negligence proximately contributed to Angela Dobyns' death, the percentage of negligence attributable solely to Angela Dobyns is 50%, (3) after reducing the total damages sustained by the plaintiff by the percentage of negligence attributable solely to Angela Dobyns, the plaintiff's recoverable damages are $50,000. A judgment was entered on the findings of the jury.

The plaintiff filed a posttrial motion on May 4, 2007, arguing that he was entitled to an *additur*, a new trial on the issue of damages only, or a new trial on all the issues as a matter of law. The circuit court denied the plaintiff's posttrial motion on September 21, 2007, holding that it would not substitute its judgment for that of the jury and that the jury's verdict was not manifestly inadequate. The plaintiff filed a timely notice of appeal. Additional facts necessary to resolve the issues on appeal will be set forth as needed.

ANALYSIS

The plaintiff first argues that the circuit court erred in denying his posttrial motion for an *additur* or, in the alternative, a new trial, because the damages awarded by the jury were manifestly inadequate and contrary to the evidence. "Generally, a decision as to whether to grant a new trial is a matter left to the sound discretion of the court, and the court's determination will not be overturned on review absent an abuse of discretion." *Wade v. Rich*, 249 Ill. App. 3d 581, 587 (1993). "However, a jury's verdict may be set aside and

18

a new trial ordered where the amount of damages is palpably inadequate or against the manifest weight of the evidence or where the jury has clearly disregarded a proven element of damages." *Wade*, 249 Ill. App. 3d at 587. "As an alternative to granting a plaintiff a new trial, *additur* has traditionally been limited in Illinois to rectifying the omission of a liquidated or easily calculated item of damages." *Hladish v. Whitman*, 192 Ill. App. 3d 561, 565 (1989). As this court has recognized, "[*additur*] is unavailable where unliquidated tort damages are at issue." *Ragan v. Williams*, 219 Ill. App. 3d 945, 948 (1991). "Additionally, *additur* is improper if a defendant does not consent to it as an alternative to a new trial." *Hladish*, 192 Ill. App. 3d at 565.

"The issue of damages is particularly within the discretion of the jury[,] and courts are reluctant to interfere with the jury's exercise of its discretion." *Chrysler v. Darnall*, 238 Ill. App. 3d 673, 678 (1992). Upon a finding of liability under the Wrongful Death Act, the jury must "fix the amount of money which will reasonably and fairly compensate the lineal next of kin *** for the pecuniary loss proved by the evidence." Illinois Pattern Jury Instructions, Civil, No. 31.04 (Supp. 2008) (hereinafter IPI Civil (Supp. 2008)). This may include the loss of money, benefits, goods, services, society, and sexual relations. IPI Civil (Supp. 2008) No. 31.04. "Where a decedent leaves lineal next of kin, the law recognizes a presumption that the lineal next of kin have sustained some substantial pecuniary loss by reason of the death." IPI Civil (Supp. 2008) No. 31.04. However, the weight to be given this presumption is for the jury to decide from the evidence in the case, including evidence of the decedent's (1) past contributions, (2) future contributions, (3) personal expenses and other deductions, (4) children's loss of future instruction, moral training, and superintendence of education by way of the death, (5) age, (6) sex, (7) health, (8) habits of industry, sobriety, and thrift, and (9) occupational abilities, as well as the descendants' grief, sorrow, and mental suffering and their relationship with the decedent. IPI Civil (Supp.

19

2008) No. 31.04. In addition, the jury is instructed that life expectancy tables are not conclusive and are to be considered in connection with other evidence. Illinois Pattern Jury Instructions, Civil, No. 31.13 (2006).

Moreover, the jury is instructed in a wrongful death case that when it is asked to place a monetary value on the loss of "society," this means "the mutual benefits that each family member receives from the other's continued existence, including love, affection, care, attention, companionship, comfort, guidance, and protection." IPI Civil (2006) No. 31.11. "In a variety of contexts, courts of review in this State have held that damages for loss of society are difficult to estimate exactly and no standard of value applies; rather, their assessment is committed to the sound discretion of the jury as to what is reasonable under the circumstances of any given case guided by its observations, experience, and sense of fairness." *Patch v. Glover*, 248 Ill. App. 3d 562, 568 (1993).

The plaintiff points to no appellate decision that has found wrongful death damages to be inadequate as a matter of law. Rather, the plaintiff argues that the damages awarded do not comport with verdicts in similar cases within the State of Illinois. However, it is impossible to measure the propriety of damages awards under the Wrongful Death Act by comparison with other wrongful death cases, as the plaintiff requests, because the propriety of those awards is not subject to exact mathematical computation and cannot be measured by comparison with other verdicts. *Barry v. Owens-Corning Fiberglas Corp.*, 282 Ill. App. 3d 199, 207 (1996). As our colleagues in the First District explained:

> "Reviewing courts rarely disturb jury awards. For good reason. We are in no better position to judge the appropriate amount of a verdict than are the 12 people who see and hear the arguments and the evidence. They use their combined wisdom and experience to reach fair and reasonable judgments. We are neither trained nor equipped to second-guess those judgments about the pain and suffering and familial

20

losses incurred by other human beings. To pretend otherwise would be sheer hubris." *Barry*, 282 Ill. App. 3d at 207.

Here, we cannot say that the $100,000 award is manifestly inadequate. There is no concrete evidence in the record of any specific loss of money or other economic loss resulting from Angie's death. Along with the evidence of the close familial ties between Angie, her widower, and her teenaged sons, along with their feelings of grief and loss, the jury was presented with a host of evidence regarding Angie's physical and mental health. It is not within our province to substitute our judgment for that of the jury to determine the monetary value of the loss of society in this case.

The fact that the defendants' counsel made the statement in closing argument that if there was liability, "then a fair verdict on damages would be a million dollars" cannot, as a matter of law, impact our analysis. The jury is instructed that what the attorneys say during argument is not to be considered as evidence and should not be taken as such. Further, the jury is instructed that if an attorney makes a statement that is not based on the evidence or reasonable inferences to be drawn from the evidence, then the jury should disregard the statement. Further, we find that counsel's statement during closing argument regarding the amount of damages constitutes an opinion and should not be considered a binding judicial admission. See *Williams v. Cahill*, 258 Ill. App. 3d 822, 826 (1994). For all of these reasons, we cannot find that the damages awarded by the jury are manifestly inadequate or contrary to the evidence.

The remaining issues on appeal are evidentiary issues regarding the admissibility of Dr. Abiodun Sangoseni's testimony on the inappropriateness of the long-term prescription of narcotics and plaintiff's exhibit 16, which was a demonstrative exhibit setting forth the various types and amounts of narcotics and other medications that were prescribed to Angie and the levels found in her system at the time of her death. "[W]e will not reverse on the

basis of an erroneous evidentiary ruling unless the error was prejudicial or the result of the trial has been materially affected." *Cretton v. Protestant Memorial Medical Center, Inc.*, 371 Ill. App. 3d 841, 854 (2007). Here, the jury found for the plaintiff on the issue of Dr. Chung's liability. The plaintiff has not set forth any connection between the evidence he claims ought to have been admitted and the issues of contributory negligence or damages. Assuming, without deciding, that the circuit court made the evidentiary errors the plaintiff suggests, we cannot find that the errors affected the outcome of the trial or prejudiced the plaintiff.

CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Randolph County is affirmed.


Affirmed.


WELCH, J., concurs.


JUSTICE CHAPMAN, dissenting:

I respectfully dissent. I believe that the $100,000 verdict awarded to the decedent's husband of 10 years and to her then 11-year-old and 14-year-old sons in this wrongful death case was so low that it is against the manifest weight of the evidence. The law presumes a substantial pecuniary loss to the next of kin in a wrongful death case. IPI Civil (Supp. 2008) No. 31.01. Without revisiting all the undisputed testimony set out in the majority opinion regarding the elements of damages, the plaintiff proved that Angela Dobyns was a loving and devoted wife and mother who, despite her battle with significant chronic pain, managed to largely carry out her motherly and wifely duties. Furthermore, she was deeply loved by

22

her children and her husband, who suffered greatly as a result of her death. The verdict bore no reasonable relationship to the plaintiff's losses, which were proved to be substantial. To find that $100,000 divided among the three survivors is adequate compensation for these losses trivializes the impact her death had on her family.

I am mindful of the deference afforded a jury and the reluctance of courts to interfere with a jury's discretion. *Chrysler v. Darnall*, 238 Ill. App. 3d 673, 678, 606 N.E.2d 553, 558 (1992). However, the trial court and the majority decision seem to imply that when there is *any* amount awarded to a plaintiff by a jury, that amount is deemed reasonable and not to be disturbed. On that basis, would $1,000 or even $100 still be a reasonable award for this substantial pecuniary loss? Such thinking disavows the case law setting forth the requisite that there *actually be* a reasonable relationship between an award and the proved damages. *Winters v. Kline*, 344 Ill. App. 3d 919, 926, 801 N.E.2d 984, 989-90 (2003); *Wade v. Rich*, 249 Ill. App. 3d 581, 587, 618 N.E.2d 1314, 1318 (1993); *DeFreezer v. Johnson*, 81 Ill. App. 2d 344, 348, 225 N.E.2d 46, 48 (1967). Even the defendants' suggestion in closing argument that $1 million would be fair compensation, if the jury were to find for the plaintiff, while not arising to a judicial admission, is some indication that an award of one-tenth of that amount was inadequate. I believe that the amount awarded is so "palpably inadequate" that the jury's verdict should be set aside and a new trial ordered. *Wade*, 249 Ill. App. 3d at 587, 618 N.E.2d at 1318.

However, I cannot agree with the plaintiff that he is entitled to a new trial on damages alone. A new trial on damages alone should be granted "if the evidence amply supports the verdict on liability, the issue of liability is sufficiently separate from the amount of damages, and the record does not suggest a compromise verdict." *Theofanis v. Sarrafi*, 339 Ill. App. 3d 460, 473, 791 N.E.2d 38, 49 (2003) (citing *Hollis v. R. Latoria Construction, Inc.*, 108 Ill. 2d 401, 408, 485 N.E.2d 4, 7 (1985)). I do not believe that the plaintiff met his burden

23

of demonstrating that the jury's verdict was not a compromise of liability against damages. See *DeFreezer*, 81 Ill. App. 2d at 348, 225 N.E.2d at 48. As the defendants argue, the record here suggests a compromise verdict. The jurors' third and fourth notes prior to the verdict evinced that they wanted to give the plaintiff zero damages or little damages *if* they found for the plaintiff and against the defendants. Despite the plaintiff's contention to the contrary, it would appear that the issues of liability and damages were closely connected in this jury's mind. See *Theofanis*, 339 Ill. App. 3d at 473, 791 N.E.2d at 49. Additionally, at the trial there were hotly contested issues of the defendants' fault and the decedent's due care, resulting in the apportionment of 50% of the fault to the decedent. See *Winters*, 344 Ill. App. 3d at 926, 801 N.E.2d at 989; *DeFreezer*, 81 Ill. App. 2d at 348, 225 N.E.2d at 48.

I would find that the court abused its discretion in not ordering a new trial. I would reverse and remand for a new trial on all the issues.

NO. 5-07-0568

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| JERRY DOBYNS, as Special Administrator of the Estate of Angela Dobyns, Deceased, | ) ) ) | Appeal from the Circuit Court of Randolph County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 05-L-33 |
| DAVID CHUNG, M.D., and SPARTA COMMUNITY HOSPITAL, | ) ) ) | Honorable Richard A. Brown, |
| Defendants-Appellees. | ) | Judge, presiding. |

**Opinion Filed**:     March 19, 2010

**Justices**:     Honorable Stephen L. Spomer, J.,

Honorable Thomas M. Welch, J., concurs
Honorable Melissa A. Chapman, J., dissents.

**Attorneys for Appellant**     J. Michael Weilmuenster, J. Brian Manion, Weilmuenster & Wigginton, P.C., 3201 West Main Street, Belleville, IL 62226

**Attorneys for Appellees**     William P. Hardy, Hinshaw & Culbertson LLP, 400 South Ninth Street, Suite 200, Springfield, IL 62701-1908; Jeffrey R. Glass, Hinshaw & Culbertson LLP, 521 West Main Street, Suite 300, Belleville, IL 62220