2019 IL App (3d) 140543
Nos. 3-14-0690, 3-14-0795, & 3-16-0133 (Consolidated)

Opinion filed August 27, 2019

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2019

| | | |
|---|---|---|
| ANGELA L. McINTYRE, Independent Administrator of the Estate of DONALD R. McINTYRE, JR., Deceased, | ) ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois, |
| Plaintiff-Appellant and Cross Appellee, | ) ) ) ) | |
| v. | ) ) | |
| RAJESH BALAGANI, D.O.; ILLINOIS LUNG INSTITUTE, LTD., an Illinois Corporation, OSF HEALTHCARE SYSTEM, a not-for-profit corporation, | ) ) ) ) | Appeal Nos. 3-14-0543 |
| | ) | 3-14-0690 |
| Defendants-Appellees and Cross Appellants, | ) ) | 3-14-0795 3-16-0133 |
| and | ) ) | Circuit No. 10-L-87 |
| SACHDEV P. THOMAS, M.D., and ONCOLOGY-HEMATOLOGY ASSOCIATES OF CENTRAL ILLINOIS, P.C. | ) ) ) ) | |
| Defendants-Appellees | ) ) | |
| (Ryschell R. Bolton, D.O.; Peoria Pulmonary Associates, Ltd., an Illinois Corporation, | ) ) ) | Honorable Scott A. Shore, |
| Defendants). | ) | Judge, Presiding. |

_____

JUSTICE HOLDRIDGE delivered the judgment of the court, with opinion.

**OPINION**

¶ 1        The plaintiff, Angela L. McIntyre (Angela), as independent administrator of the estate of her deceased husband, Donald R. McIntyre (Donald), brought a medical malpractice action against several physicians, their respective employers, and the hospital where Donald was treated and died. Angela sought damages allegedly resulting from the negligent treatment that Donald received on September 7 and 8, 2009, while he was a patient in the medical intensive care unit (MICU) at OSF St. Francis Medical Center.

¶ 2        Angela brought the following claims: (1) a negligence claim against Dr. Rajesh Balagani and his employers, Illinois Lung Institute, Ltd. and Peoria Pulmonary Associates, Ltd. (collectively, the Balagani defendants); (2) a claim against OSF Healthcare System (OSF), alleging that OSF was derivatively liable for Dr. Balagani's negligence because Dr. Balagani was OSF's apparent agent; (3) a negligence claim against Dr. Ryschell R. Bolton, a third-year medical resident and her employer, OSF; (4) a claim against OSF for institutional negligence relating to the conduct of two OSF respiratory therapists who intubated Donald prior to his death; and (5) a negligence claim against Dr. Sachdev P. Thomas, the on-call hematologist who consulted with Drs. Balagani and Bolton regarding Donald's treatment, and Dr. Thomas's employers, Oncology-Hematology Associates of Central Illinois, P.C., Peoria Cancer Center, P.C., Illinois Cancer Care Center, P.C., and Peoria Cancer Care Center, P.C. (collectively, the Thomas defendants).

¶ 3        The Thomas defendants filed a motion for summary judgment, alleging that Dr. Thomas did not owe Donald a duty of care as an on-call physician. The trial court granted the motion and the matter proceeded to a jury trial with the remaining defendants. The jury returned a verdict in

favor of Angela and against the Balagani defendants and awarded Angela damages of $1.1 million for loss of income, goods, and services and $500,000 for loss of companionship and society. However, the jury returned a verdict in favor of Dr. Bolton and OSF as to institutional negligence. Angela and the Balagani defendants filed posttrial motions, which the court denied. These appeals followed.

¶ 4                                                    FACTS

¶ 5        Donald first presented to the emergency room (ER) at OSF on September 6, 2009, after fainting at a CVS pharmacy. He complained of a headache, facial pain, and neck stiffness. His hemoglobin was tested at 11.1 g/dL, which is considered mild anemia (the normal range is 13 to 16 g/dL). He was given a complete workup, which revealed no cause of his condition. He was given antibiotics for a presumed case of sinusitis and released.

¶ 6        The following day, Angela took Donald back to the hospital because he looked yellow. He arrived at approximately 11 a.m. complaining of low back pain, headache, fatigue, chills, shortness of breath, and blood in his urine. He fainted about an hour after arrival, and later, his heart stopped beating for 12 to 16 seconds. A cardiac workup suggested that Donald might have had a heart attack from an occluded artery or inflammation of his heart or surrounding heart tissue lining. His liver enzymes were very elevated, which suggested possible hepatitis. Doctors detected bilirubin, which can be caused either by fractured blood cells or by a blockage in the liver or gallbladder. Donald's white blood cell count was elevated and he showed signs of possible infection, such as flu-like symptoms, a fever of 102.4 degrees Fahrenheit, headache, muscle aches, and sinus symptoms. He was tachycardic and sweating. His hemoglobin was found to be 7.0 g/dL, down from 11.1 g/dL the previous day, which is considered anemic. His

hematuria (blood in the urine) was rated at "4 plus," which is the highest amount of blood or hemoglobin one can have in one's urine.

¶ 7        Dr. Rose Haisler, the attending emergency department physician that day, testified that, after she reviewed Donald's blood tests results in the ER, she was aware that Donald had "hemolytic anemia" (HA). HA is a rare disorder that causes the patient's own immune system to attack and eventually destroy healthy red blood cells. Red blood cells can be described as "bags" of hemoglobin, the substance responsible for transmitting oxygen from the blood to the body's tissues during circulation. When a patient has HA, antibodies that normally attack viruses and other infectious agents bind to the patient's own red blood cells. Each time blood passes through the spleen, white blood cells tear the antibodies away from the red blood cells, stripping off small pieces of the red blood cells in the process. As a result, the red blood cells become smaller and smaller until they die in the spleen. If untreated, this continuous destruction of red blood cells results in death due to insufficient oxygen in the body.

¶ 8        In addition to HA, Donald also had elevated levels of methemoglobin. Methemoglobin decreases the amount of oxygen that hemoglobin is able to pick up as the blood goes through the lungs and also interferes with or inhibits the release of oxygen from hemoglobin into the body's tissues. This condition increased the likelihood that Donald could die from HA. Treatment of HA requires the transfusion of healthy red blood cells, which maintains the blood's oxygen carrying capacity, coupled with the administration of steroids and immunoglobulin by intravenous delivery (IVIG), which suppresses the chemical signaling error that causes the body's immune system to attack its own red blood cells.

¶ 9        Dr. Haisler admitted Donald to the MICU at OSF because she suspected he had HA and he had "deteriorated so quickly." Dr. Haisler described HA as "incredibly rare." This was the

4

first suspected case of HA she had seen outside a textbook. When asked if it would be appropriate to provide blood to assist the patient in maintaining enough red blood cells to provide oxygen for the body, Dr. Haisler responded, "no." She explained that giving blood to treat HA, unlike giving blood to treat blood loss occurring from an open wound, is "very complex," and is not something she would do without consulting a hematologist. She testified that HA is not treated in an emergency department. Nevertheless, Dr. Haisler ordered: (1) a "Coombs test" to be performed (the only way to confirm that a patient is suffering from HA), (2) Donald's blood to be crossmatched, and (3) four units of un-crossmatched blood (O negative blood which can be given to anyone regardless of their blood type) to be prepared by the blood bank.

¶ 10      Dr. Bolton, an emergency medicine resident physician working under the attending physician, Dr. Balagani, treated Donald while he was in the MICU. According to Dr. Bolton's entries into the medical record, Donald was admitted to the MICU with a diagnosis of "autoimmune [HA] with an uncertain etiology." Donald's blood was tested again at 4:23 p.m. The test showed that Donald's hemoglobin had decreased another gram to 6 g/dL. Dr. Bolton testified that she was notified of this blood test result at 4:45 p.m. and that she ordered that blood be given to Donald because a hemoglobin of less than 7 g/dL "requires blood." Dr. Bolton stated that she ordered the un-crossmatched, O-negative blood to be transfused because it was "urgent" in order to maintain Donald's red blood cell levels.  Two of the four units of un-crossmatched, O-negative blood ordered by Dr. Haisler were provided to Donald at Dr. Bolton's direction at 5:16 p.m. and 5:34 p.m. Around this time, Dr. Bolton performed a lumbar puncture to test for meningitis. Afterwards, she and Dr. Balagani examined Donald and spent approximately an hour discussing his symptoms and treatment plan. While awaiting the results of the lumbar puncture,

5

they transferred Donald to an isolation room because they were concerned that he might have an infection that might be contagious.

¶ 11   At 9:40 p.m., Donald was stable, meaning that his vital signs were not changing. Dr. Bolton told Donald's family members that Donald had HA and was very sick, and that specialists would be coming to see him. Donald's hemoglobin was tested again at 9:57 p.m. and it measured 6.3 g/dL. Dr. Bolton was notified of the new test results at 10:40 p.m. She later testified that she considered the 6.3 g/dL value to be "equivocal," given lab variability, and surmised that Donald's hemoglobin level could be the same as it was before. Dr. Bolton told Dr. Balagani about the hemoglobin results, and he advised her that they needed to get a specialist involved because, at that point, they had enough lab test results to conclude that Donald was suffering from HA.

¶ 12   At approximately 10:30 p.m., Dr. Bolton spoke with Dr. Thomas, the on-call hematologist. When asked during the trial to describe her understanding of her consultation with Dr. Thomas, Dr. Bolton replied: "My understanding was that we were to give steroids, to give IVIG, to try to get cross-matched blood, *but not to give any more O negative blood*, and also if I was concerned about infection, which we were, that we should consult an infectious disease doctor to get their opinion with regards to steroids." (Emphasis added.) Dr. Bolton then testified, "based upon that," she immediately contacted Dr. John Farrell, the on-call infectious disease specialist. When asked what her understanding of the treatment plan was, based upon her consultation with Dr. Farrell, Dr. Bolton responded, "it was my understanding that steroids could weaken his immune system, and so we should proceed with caution, and therefore, it was my understanding that we should not give steroids at this point."

6

¶ 13    Dr. Bolton then immediately called Dr. Balagani, communicated both of the specialists' treatment recommendations, and told him how sick Donald was "because [she] was still worried about him." Dr. Bolton testified that, after weighing the benefits against the risks, Dr. Balagani recommended that they give Donald IVIG and steroids,[1] but he "agreed that we needed to try to get cross-matched blood and not to give any more O negative blood." Dr. Bolton noted in the medical record that Dr. Balagani "did not want any more blood transfused." In her testimony, Dr. Bolton explained that Dr. Balagani meant no more *un-crossmatched* blood, which Dr. Balagani confirmed in his own testimony.[2] She stated that Dr. Balagani gave her this order sometime after her consultation with Dr. Thomas. Dr. Bolton testified that she ordered everything that she and Dr. Balagani agreed upon "based on Dr. Farrell and Dr. Thomas' recommendations."

¶ 14    However, during cross-examination, Dr. Bolton admitted that there was nothing in the medical record, including her own notations, suggesting that Dr. Thomas had told her not to transfuse any more O negative blood; Dr. Bolton's notation merely stated that *Dr. Balagani* "did not want any more blood transfused." Moreover, Dr. Bolton admitted that the medical record reflected that Dr. Thomas recommended that steroids and IVIG be given to treat Donald's condition and that there had been no recommendation to delay these treatments.

¶ 15    OSF's blood bank was having difficulty crossmatching Donald's blood, so they transferred the job to the Red Cross blood bank. They said they "had never seen anything like this when trying to crossmatch blood." Dr. Bolton testified that, by midnight, the blood bank still did not know when it would be available; they said it could be hours, or it could be the next day. Dr. Bolton urged them to get it done as soon as possible. She testified that, based on her

___

[1] It was decided afterwards to hold off on steroids until they further evaluated Donald's condition because they did not want to weaken his immune system.

[2] According to Dr. Bolton, Dr. Balagani told her not to give more O negative blood out of concern that they would be adding more antibodies that would cause him to hemolyze faster.

7

conversation with Dr. Thomas, she believed Donald needed blood, but only crossmatched blood. Dr. Bolton ordered IVIG at 10:53 p.m. However, the pharmacy did not fill that order until 12:50 a.m. Dr. Bolton ordered steroids to be administered at 12:49 a.m., but that order was not filled until 1:18 a.m. and steroids were not given to Donald until approximately 2:00 a.m. IVIG and steroids can take hours or even days to take effect.

¶ 16        At approximately 2:35 a.m., Donald stopped breathing and his heart rate dropped precipitously. A "code blue" was called two minutes later. (Before he coded, Donald had not been complaining of anything and his oxygen levels were normal.) During the code, an IVIG treatment was given and Donald's hemoglobin was tested at 5.4 g/dL. Donald was intubated at 2:45 a.m. and again 3:05 a.m. However, efforts to revive him were unsuccessful. Donald was given two additional units of O negative blood at 3:08 a.m. and 3:14 a.m. Dr. Bolton later testified that Donald was "already dead" at that time. Donald was pronounced dead at 3:40 a.m. An autopsy performed at the family's request revealed "no anatomic cause of death" and no lung infection or other infection. The death certificate signed by Dr. Balagani identified the cause of death as cardiac arrest as a result of shock due to HA.

¶ 17        Angela subsequently filed this medical malpractice action. The Thomas defendants filed a motion for summary judgment, arguing that Dr. Thomas owed no duty of care to Donald due to his status as an on-call consulting physician. The trial court granted the motion, ruling that, as a matter of "public policy," the duration of the contact between Drs. Thomas and Bolton was insufficient to establish a doctor/patient relationship or a duty of care.

¶ 18        Before the matter proceeded to trial, Angela filed a motion *in limine* to bar defense counsel from asking questions that would suggest that Dr. Thomas was the sole cause of Donald's death. In support of her motion, Angela noted that no expert had opined that Dr.

8

Thomas was the sole cause of Donald's death and argued that it would be highly inflammatory to imply as much to the jury. The trial court granted Angela's motion "as to duty, breach, and violation of the standard of care." The court reasoned that allowing the defendants to suggest that Dr. Thomas had breached the standard of care or was negligent in any fashion would conflict with the court's prior ruling that Dr. Thomas owed no duty of care to Donald. However, the court ruled that the defendants were not barred from inquiring or presenting evidence regarding "Dr. Thomas' role in the treatment and advice given."

¶ 19 The Balagani defendants later sought to present evidence suggesting that Dr. Thomas was the sole proximate cause of Donald's death. Specifically, they sought to cross-examine Dr. Charles Abrams, Angela's testifying expert hematologist, about some of his prior opinions about Dr. Thomas's conduct in treating Donald.[3] In his Illinois Supreme Court Rule 213 disclosures, Dr. Abrams opined that Dr. Thomas had breached the standard of care by failing to recommend the immediate resumption of blood transfusions. Dr. Abrams further opined that: (1) "[a]n ICU physician does not typically contact the on-call hematologist at 11:45 p.m. unless the hematologist's advice is urgently sought"; (2) Dr. Thomas "should have obtained a complete picture of Mr. McIntyre's condition and stability," which "is difficult to do over the telephone"; (3) if Dr. Thomas had any uncertainty about the situation, Dr. Thomas "should have come to the hospital that night to personally evaluate [Donald]"; (4) Dr. Thomas "should have made sure (at the time of Dr. Bolton's phone call) that steroids, IVIG, and blood transfusion were already on board and being given to Mr. McIntyre."; (5) Dr. Thomas failed to obtain a complete evaluation of the serial hemoglobin values that were available and failed to assure that Donald was "expeditiously being given the appropriate medications by the ICU team to treat autoimmune

---

[3] Angela retained Dr. Abrams to establish the standard of care for a hematologist under the circumstances, and Dr. Abrams had issued his initial expert report before Dr. Thomas was dismissed as a defendant.

[HA]," (*i.e.*, "steroids and IVIG"); (6) Dr. Thomas "appeared to have failed to inquire about the status of *** McIntyre's blood transfusions and to have advised and strongly advocated for additional blood to be given immediately to Mr. McIntyre."; (7) Instead, Dr. Thomas "decided to wait until the next morning to assess Mr. McIntyre in person"; and (8) "[h]ad Dr. Thomas created the appropriate sense of urgency at the time of the 11:45 p.m. phone call (by coming to the hospital himself or even over the telephone) and advocated for the immediate resumption of O-negative blood transfusions, [Donald] would likely be alive today. [Dr. Thomas's] failure to do so was beneath the standard of care."

¶ 20    Similarly, during his subsequent discovery deposition, Dr. Abrams explicitly faulted Dr. Thomas for "not doing what was necessary to keep [Donald] alive that night." Specifically, Dr. Abrams testified that Dr. Thomas "should have inquired further and determined what the hemolysis process was from the lab values and ordered blood [transfusions]." Dr. Abrams testified that "[w]hat is relevant is that a medical team was calling a specialist that treats this specific disease. The medical team might know all the relevant information, they might not. It's up to Dr. Thomas to solicit all that he needs to know." When asked whether he "knew the answer to that question," Dr. Abrams stated, "[e]ither he did and made an egregious error, or the error was in not soliciting the information."

¶ 21    Counsel for the Balagani defendants sought to question Dr. Abrams about these opinions and about his opinion regarding the proximate cause of Donald's death. Before questioning Dr. Abrams on these matters, defense counsel asked the court to clarify its prior *in limine* ruling regarding Dr. Thomas and proximate causation issues. The court clarified that the defendants were not prohibited from suggesting that Dr. Thomas was the sole proximate cause of the injuries suffered by Donald provided that there was "expert testimony to say something of that

10

nature" or evidence of "reliance by somebody that was in the chain of circumstance." The court explained that the prior order on Angela's motion *in limine* did not preclude the defendants from suggesting that Dr. Thomas was the sole proximate cause of Donald's death. Instead, that ruling addressed whether Dr. Thomas owed a legal duty to Donald, not whether Dr. Thomas performed some act which was a proximate cause of Donald's injuries. Accordingly, the court concluded that the defendants were not barred from showing that Dr. Thomas performed some "intervening or superseding act" that, "just like any other intervening circumstance, whether it was an ambulance crash on the way to the hospital or any other number of things," could be inferred from the evidence to be the sole proximate cause of the injury. The court also stated that testimony supporting such an inference was "admissible for that purpose," and "would not be barred by any prior ruling." Nor was there any reason that such testimony should be "otherwise limited." In sum, the trial court ruled that the defendants could delve into Thomas's role in proximately causing Donald's death if they could establish by competent evidence that "others relied upon [Dr. Thomas's] guidance," and "the jury needs to decide whether that was the cause, sole proximate cause, or not."

¶ 22 During cross-examination, Dr. Abrams testified that he had initially opined that Dr. Thomas was at fault for not instructing Dr. Bolton that Donald was to receive continuous blood transfusions to stabilize him, but that his opinion changed after he read Dr. Thomas's supplemental deposition wherein Dr. Thomas retracted his earlier testimony that he had ordered no O-negative blood to be transfused. In response, Dr. Balagani's counsel stated, "[well] we'll ask Dr. Thomas about that, I guess." On redirect, Angela's counsel asked whether Dr. Thomas's statement in his supplemental deposition that "I clearly told them to give blood" was what changed Dr. Abrams's mind. Dr. Abrams responded in the affirmative.

11

¶ 23	Based on Dr. Abrams's Rule 213 disclosures, the Balagani defendants attempted to make an offer of proof that Dr. Abrams, if called to the stand, would testify that Dr. Thomas breached the standard of care and that such breach was the sole proximate cause of Donald's death. The trial court initially granted the oral offer of proof but then reversed its ruling when Angela's counsel withdrew her concurrence and defense counsel was unable to cite to any "sole proximate cause" opinion in Dr. Abrams's Rule 213 disclosures. Defense counsel later presented a new offer of proof without any reference to Dr. Thomas as the "sole" proximate cause. The trial court stood on its prior ruling. Specifically, the court stated:

"the defense may certainly show Dr. Thomas' role and the defense has indicated that they're showing reliance upon Dr. Thomas' advice as a consult. But in order for there to have been a violation of standard of care, there would have to have been a duty of care and the law of this case pursuant to previous rulings adopted by this Court is that there was no doctor-patient relationship between Dr. Thomas and [Donald] and, therefore, no duty. Whether the advice was in error or not does not really become the issue. The issue is the reasonable reliance on that advice by [the defendants] and, therefore, the previous rulings of the Court with regard to Dr. Thomas's testimony and liability are again confirmed by this Court."

¶ 24	On several occasions during the trial, Dr. Bolton attempted to testify as to what Dr. Thomas told her regarding Donald's treatment. Each time, Angela's counsel objected on hearsay grounds. The trial court sustained the objections and ordered Dr. Bolton to testify only as to her side of the conversation (*i.e.*, what she said to Dr. Thomas). Each time, the court instructed the jury to disregard any testimony that Bolton gave regarding what Dr. Thomas had told her. The court also allowed Dr. Bolton to testify, over an objection from Angela's counsel, about her

12

"understanding" of the treatment plan based upon her consultation with Dr. Thomas. Moreover, as noted above, Dr. Bolton testified on at least one occasion that her and Dr. Balagani's treatment of Donald was "based on" Dr. Thomas's recommendations. However, Dr. Bolton was not allowed to testify regarding what Dr. Thomas had said to her.

¶ 25    Moreover, the trial court granted Angela's motion *in limine* to bar the Balagani defendants from asking Dr. Farrell about the duty of a consulting physician "in a back door attempt to impugn" Dr. Thomas's conduct. In granting Angela's motion, the court ruled that the defendants would not be allowed to use this line of questioning to "cast aspersions upon other consultants," specifically Dr. Thomas. Defense counsel never called Dr. Thomas to the stand to ask him what he had told Dr. Bolton regarding Donald's care.

¶ 26    Every expert that testified at trial, including Angela's experts, agreed that it was within the standard of care for the treating ICU doctors to consult with a hematologist to guide Donald's care. Beyond that, however, several of the experts disagreed as to the specific standard of care for treating the type of HA that Donald was suffering from when he was admitted to the MICU. Specifically, the experts disagreed on whether the standard of care required that Donald be given transfusions of un-crossmatched (O-negative) blood to replace his lost red blood cells.

¶ 27    Dr. Abrams opined that, while crossmatched blood should be given when there is "plenty of time," severely anemic patients with aggressive HA like Donald must be transfused with un-crossmatched, O-negative blood. According to Dr. Abrams, O-negative blood is acceptable for everyone and will not be hemolyzed (destroyed) by a severely anemic patient any faster than the patient's own red blood cells. Moreover, because Donald had not experienced an adverse reaction to the first transfusion with O-negative blood at 5:30 p.m., his doctors should not have hesitated to give him more O-negative blood later that evening. Dr. Abrams also opined that the

13

treatment for autoimmune HA also involves the administration of IVIG and steroids. The blood transfusions provide fresh red blood cells, which keeps the patient alive while the IVIG and steroids work to quell the immune response and cure the disease. Dr. Abrams opined that the ICU doctors' failure to give Donald more transfusions of O-negative blood, coupled perhaps with their failure to administer steroids and IVIG in a timely manner, caused Donald's death.

¶ 28    Similarly, Dr. Timothy Albertson, Angela's liability expert, opined that: (1) as the attending critical care physician managing the MICU, Dr. Balagani was "ultimately responsible" for Donald's care, and he should have known how to treat autoimmune HA; and (2) Dr. Balagani's failure to maintain Donald's hemoglobin levels by giving repeated (un-crossmatched) blood transfusions and his failure to give IVIG and steroids earlier in the day deviated from the standard of care and was a cause of Donald's death.

¶ 29    Two defense experts disagreed. Dr. Martin Tobin testified that giving more blood to Donald would have further accelerated the hemolysis, essentially "adding fuel to the fire." Another defense expert, Dr. DeBoisblanc, testified that he also would not have given Donald more blood, for several reasons. First, he opined that the anemia Donald was experiencing was not necessarily life threatening, and that he saw patients all the time "walking around" with hemoglobin levels in the threes (lower than Donald's). Thus, in Dr. DeBoisblanc's opinion, there was something else aside from his low hemoglobin count that was driving Donald's illness. In addition, Dr. DeBoisblanc noted that the elevated lactic acid in Donald's blood meant that there was something wrong with the whole body; multiple organs were unable to utilize or process oxygen. Moreover, the hemoglobin inside red blood cells is toxic, and when a red blood cell is destroyed, it releases "free hemoglobin" into the bloodstream, which Dr. DeBoisblanc compared to having "Clorox bleach in your bloodstream." The body normally produces a substance called

14

haptoglobin to scavenge up the free hemoglobin, but if the hemolysis is brink, the haptoglobin cannot keep up and it is left to the kidneys to filter out the toxins. When the kidneys become overwhelmed, the patient ends up with blood in the urine, which is what happened to Donald. Dr. DeBoisblanc opined that more transfusions of O-negative blood would have worsened the problem because it would produce more free hemoglobin. In Dr. DeBoisblanc's opinion, the hemolysis that Donald was experiencing was too rapid to allow the free hemoglobin to be cleared from his body; it was a fatal case, no matter what anyone did for him.

¶ 30    The experts presented similar but somewhat differing opinions as to whether and to what extent a critical care ICU doctor should know how to treat a rare condition like the autoimmune HA that Donald was experiencing when he was admitted to the MICU. Dr. Balagani testified that a critical care doctor is a generalist whose role is to stabilize the patient until the relevant specialist takes over.  Critical care doctors "rely on their consultants." According to Dr. Balagani, HA is not something usually treated in an ICU and the extremely aggressive form of HA that Donald experienced was very unusual. For HA that complicated, Dr. Balagani wanted to "make sure our consultants were there."

¶ 31    Similarly, Dr. Tobin testified that: (1) it was appropriate for Drs. Balagani and Bolton to wait for a hematology consult until the time period when Dr. Thomas was called; (2) HA is typically not an emergency requiring emergent care and treatment, and patients with autoimmune HA are typically not seen and treated in the ICU; (3) the standard of care did not require Drs. Balagani and Bolton to be experts in the treatment of HA in the critical care setting; and (4) Dr. Balagani's approach to treating Donald in the face of autoimmune HA was appropriate. Another defense expert, Dr. Morey Blinder, testified that Donald had a rare form of HA that intensive care doctors do not typically treat, and that the MICU team should not be faulted for a lack of

15

experience in dealing with this rare condition. Dr. Blinder further opined that: (1) "[t]here is very little expertise outside the area of hematology with respect to the diagnosis and treatment of [HA]"; (2) "[t]here is even less experience, even among hematologists, regarding the diagnosis, care, and treatment of autoimmune [HA]"; and (3) there is greatly limited experience on the part of hematologists in treating autoimmune [HA] mixed type."

¶ 32        As noted above, Dr. Albertson, Angela's liability expert, opined that Dr. Balagani was "ultimately responsible" for Donald's care, and he should have known how to treat autoimmune HA. However, Dr. Albertson also acknowledged that it was "perfectly reasonable" for Drs. Balagani and Bolton to rely upon the advice they received from hematology. Moreover, Dr. Abrams testified that the hematologist (Dr. Thomas) had superior knowledge about hematological problems and that, under the circumstances of this case, he would expect Drs. Balagani and Bolton to rely upon direction from the hematologist.

¶ 33        During cross-examination, Dr. DeBoisblanc testified that, even after having discussions with a consultant, it was the critical care physician's decision whether or not the patient needs more transfusions. He further testified that: (1) IVIG and steroids were well-known therapies for HA which were administered to reverse the process causing hemolysis; (2) it is appropriate to treat HA patients with steroids even if infection is suspected as a cause; and (3) Donald was never diagnosed with an infection.

¶ 34        Angela presented the following evidence as to damages. Angela testified that Donald worked at RLI Insurance (RLI) for 23 years, starting as inventory clerk, and then working his way up to becoming a vice president of RLI and running its print shop. Angela worked with Donald at RLI for 17 years. She testified that Donald was a healthy and very active man who worked long hours, took his work seriously, and had a great relationship with clients. It was

16

Donald's dream to run his own printing business. When he floated the idea to some of RLI's clients, they told him that he was so good at what he did that they would take their printing needs to Donald's upstart business. Donald left RLI in 2007, built an annex to his house where he could run the business, and took out a $40,000 bank loan to purchase the necessary printing equipment. By 2008, he was receiving a lot of business from former RLI clients (including CEFCU and others) and attracting new clients. These clients wanted Donald to perform larger jobs, which required him to buy larger printing equipment and expand his business. According to Angela, Donald was busy up until the time of his hospitalization in September 2009 and it appeared that Donald's plan to grow the business was working. Donald was very happy and content with how the business was progressing.

¶ 35    Tim Kruger, Donald's former coworker, also testified on Angela's behalf. Kruger was a former chief account comptroller and treasurer at RLI. Kruger worked alongside Donald and frequently interacted with him in the print shop. Kruger testified that Donald was an extremely hard worker who spent long hours in the print shop and had a desire to satisfy his customers. Kruger further testified as to Donald's ingenuity and resourcefulness by describing how Donald had developed and implemented a plan to utilize RLI's print shop for external customers so that the printing machinery, which was often idle when not being used for printing at RLI, could be turned into a profit center, thereby bringing in more revenue to RLI.

¶ 36    Curtis Wardelman, a Certified Public Accountant and a close friend of Angela's and Donald's, also testified. Wardelman met Donald through RLI. He did consulting work for RLI and handled financial matters for some of RLI's executives. Wardelman testified that he observed Donald's work habits and abilities for many years. He stated that Donald was an extremely hard worker who arrived at work by 6:00 a.m. each workday. Donald started out as a

17

pressman, then became a production supervisor, then a manager, and then the assistant vice president of RLI's printing and mail systems. Wardelman testified that Donald came up with the idea of using RLI's print shop to generate additional profit from outside clients. Donald successfully solicited clients for this venture (including CEFCU and Par-a-Dice Casino), and turned RLI's printing shop from a cost center to a profit center. Wardelman testified that Donald had been "very successful" in developing that business model.

¶ 37    Wardelman testified that Donald approached him in 2006 for professional advice and guidance because Donald wanted to build his own printing business. Donald approached Wardelman because of their friendship and because Wardelman had experience in planning and executing plans to put new businesses together. Wardelman testified that, by the time he left RLI in 2006, Donald had a plan to obtain space, equipment, and supplies for the business. Donald bought his first printing press and formally started his new business in September 2007. At that time, Donald was doing side jobs to augment his income in addition to the six months of income he had obtained from RLI upon leaving. Wardelman opined that Donald was developing his business "methodically" and was trying to do things in stages, adding further printing presses depending how the business was growing. By 2008, the business was growing and Donald wanted to grow it even more. Gross sales began to jump. By 2009, Donald appeared to be busier and busier. Between January and April 2009 (during the heart of the recession), Donald obtained a $40,000 loan to purchase two new, larger, multiple color printing presses in order to meet the increasing demands of his clients. Wardelman testified that Donald was "extremely busy" thereafter and that it was Wardelman's impression that Donald's business was growing and would continue to grow. Donald was doing work for CEFCU, Par-A-Dice, and the Peoria

18

Civic Center. RLI was getting out of the printing business at that time, and Donald had maintained contacts with RLI's former clients and was soliciting their business.

¶ 38 Wardelman stated that Donald's printing business had a net loss of $24,000 in 2007, but turned a profit of $11,000 to $12,000 in 2008 on gross sales of $117,000. According to Wardelman, from January 1, 2009, through the date of Donald's death in September 2009, Donald's business had gross sales of $65,000 with a net income of approximately $15,000. When asked to explain the figures for 2009, Wardelman admitted that there was "some hesitation about 2009" because Donald's software systems for his printing business were password protected "so we were never able to get into the software to see what was there." When Angela's counsel tried to solicit Wardelman's opinion as to "what type of projected growth the business might have," the trial court sustained defense counsel's objections based on speculation, lack of foundation, and failure to disclose under Rule 213. During cross-examination, Wardelman admitted that he had never prepared a formal business plan for Donald's business and was not aware of such a plan. He also admitted that he could not say one way or the other whether the business would have "taken off" or "failed."

¶ 39 Wardelman further testified that, after Donald died in September 2009, the business completely stopped because there was no one to run it. All of the printing presses and other equipment had to be liquidated, and Angela had to take a loss while wrapping up the business.

¶ 40 Prior to trial, Angela disclosed an expert witness, economist Dr. Edward Sattler, to provide opinion testimony on the projected growth of Donald's printing business. Dr. Sattler purportedly would have testified that Donald's business would have steadily increased its profits and would have yielded a profit of $125,000 by 2013. OSF moved *in limine* to bar Dr. Sattler's testimony as speculative and without foundation. The trial court denied the motion, ruling that

19

OSF's objections were to the weight of Dr. Sattler's proposed opinion, not its admissibility. Nevertheless, Angela never called Dr. Sattler at trial.

¶ 41 During closing argument, Angela's counsel told the jury that he would make suggestions based upon the evidence with regard to Donald's background and experience, the history of his being successful in providing for his family and his income growth, his previous occupational history, and evidence of his industriousness and occupational abilities. Counsel noted that his argument was merely a suggestion and that it was up to the jury to choose what it believed was appropriate. At one point during closing, Angela's counsel argued as follows:

> "I'm going to estimate that by 2013 Donald was making right around or a little bit more than he was when he left RLI. I think that's conservative, but you may disagree and that's up to you. So I'm going to pick—I believe the last salary was $117,000. I'm going to suggest that if you estimate that he would have made income of $125,0000 from his business and that projects out through 2028 where he would have been age 67, that would be a total of $2 million in gross income. Now, the law says that you're going to have to adjust this for what they call present cash value *** So I'm estimating that over that period of time, I think being conservative to age 67 it would be $1,250,000 today."

¶ 42 During the jury instruction conference, the trial court approved the jury instruction tendered by Angela, which was a very slightly modified version of Illinois Pattern Jury Instruction, Civil, No. 31.04 (2007) (hereinafter IPI Civil (2007) No. 31.04), the jury instruction governing the determination of damages for wrongful death that are recoverable by a widow or next of kin. IPI Civil (2007) No. 31.04 reads, as follows:

"If you decide for the plaintiff on the question of liability, you must then fix the amount of money which will reasonably and fairly compensate the [lineal next of kin, e.g., widow] of the decedent for the pecuniary loss proved by the evidence to have resulted to the [lineal next of kin] of the decedent. "Pecuniary loss" may include loss of money, benefits, goods, services, [and] society [and sexual relations].

Where a decedent leaves [lineal next of kin], the law recognizes a presumption that the [lineal next of kin] have sustained some substantial pecuniary loss by reason of the death. The weight to be given this presumption is for you to decide from the evidence in this case.

In determining pecuniary loss, you may consider what the evidence shows concerning the following:

[1. What (money,) (benefits,) (goods,) (and) (services) the decedent customarily contributed in the past;]

[2. What (money,) (benefits,) (goods,) (and) (services) the decedent was likely to have contributed in the future;]

[3. Decedent's personal expenses (and other deductions);]

[4. What instruction, moral training, and superintendence of education the decedent might reasonably have been expected to give his child had he lived;]

[5. His age;]

[6. His sex;]

[7. His health;]

21

[8. His habits of (industry,) (sobriety,) (and) (thrift);]

[9. His occupational abilities;]

[10. The grief, sorrow, and mental suffering of next of kin;]

[11. The relationship between [lineal next of kin, e.g. son] and [decedent].]

[12. The marital relationship that existed between [widow/widower] and [decedent].]

[Widow/widower] is not entitled to damages for loss of [decedent's] society and sexual relations after [date of remarriage]."

¶ 43 The trial court gave this instruction to the jury almost exactly as written above except it inserted the names of Donald and his wife and children throughout and omitted the final sentence of the pattern instruction and the parenthetical phrase "and other deductions" from item number 3 of the pattern instruction.

¶ 44 Following the trial, the jury returned a verdict: (1) in favor of Angela and against the Balagani defendants; (2) in favor of Angela and against OSF as to Dr. Balagani's apparent agency and OSF's derivative liability for Dr. Balagani's negligence; (3) in favor of Dr. Bolton and against Angela as to Dr. Bolton's alleged negligence; and (4) in favor of OSF and against Angela as to Angela's claim for institutional negligence. The jury awarded Angela damages in the amount of $1.1 million for loss of money, goods, and services, and $500,000 for loss of society. The jury apportioned 70% responsibility to Dr. Balagani and 30% responsibility to OSF.

¶ 45 Angela subsequently filed a posttrial motion for new trial on damages only, arguing that the jury's award of $500,000 for loss of society was grossly inadequate. The trial court denied Angela's motion.

22

¶ 46    The Balagani defendants filed posttrial motions challenging the jury's award for lost future earnings. The trial court denied the defendants' motions. The court ruled that the jury "had more than sufficient evidence *** upon which to find and from which to infer the industriousness of the decedent and his likely future income and support of his family." The court was not concerned with the issue whether the jury was advised of Donald's "last income" so long as the jury did not use such evidence as a "multiplication factor to determine damages," which it "obviously" did not. The court ruled that the evidence of Donald's most recent income was "part of industriousness," and noted that there was a "great deal of other evidence" from which the jury could infer damages, including other evidence of Donald's industriousness and evidence of the nature of his work habits, his intentions for his business, and the potential income. The court found that, even if the income from Donald's business was "far less" than it was, "still the jury could easily inferred fand allowed damages in the amount that they did." With regard to the jury's apportionment of damages, the court ruled that the jury was properly instructed and "had sufficient evidence before [it] to render the apportionment" that it did.

¶ 47    These consolidated appeals followed.

¶ 48    After Angela filed her appellant's brief (and two days before the expiration of the twice-extended deadline for the Balagani defendants to file their appellees'/cross-appellants' briefs), the Balagani defendants moved in the trial court for leave to supplement the record on appeal with various documents, including a set of numbered jury instructions, which included proposed instructions tendered by the defendants that the trial court had rejected. This court suspended briefing so the Balagani defendants could file a written motion to supplement the record in the trial court, which they subsequently filed with the trial court. Angela objected to the motion, arguing that the Balagani defendants should not be allowed to supplement the record with the

numbered jury instructions because they failed to act with diligence in supplementing the record and because the document at issue was not an original document presented to the trial court and file-stamped by the clerk. The trial court granted the motion over Angela's objection. Angela also appeals the trial court's ruling on this issue.

¶ 49                                                    ANALYSIS

¶ 51        Angela, the Balagani defendants, and OSF have each appealed aspects of the trial court's judgment. We address each of their arguments in turn.

¶ 52                                              I. Angela's Appeal

¶ 53        On appeal, Angela argues that the trial court erred when it (1) granted summary judgment in favor of the Thomas defendants, (2) denied her posttrial motion for a new trial as to damages, and (3) granted the Balagani defendants' motion to supplement the record on appeal.

¶ 54                      A. Summary Judgment in Favor of the Thomas Defendants

¶ 55        As an initial matter, the Thomas defendants argue that this court lacks jurisdiction to consider the propriety of the trial court's summary judgment order because Angela filed her notice of appeal prematurely, *i.e.*, after the trial court entered judgment on the jury's verdict but before the court ruled on the pending postjudgment motions.

¶ 56        Illinois Supreme Court Rule 303(a) states, in relevant part, as follows:

> "(1) The notice of appeal must be filed with the clerk of the circuit court within 30 days after the entry of the final judgment appealed from, or, if a timely posttrial motion directed against the judgment is filed, whether in a jury or a nonjury case, within 30 days after the entry of the order disposing of the last pending

24

postjudgment motion directed against that judgment or order, irrespective of whether the circuit court had entered a series of final orders that were modified pursuant to postjudgment motions. * * *

(2) When a timely postjudgment motion has been filed by any party, whether in a jury case or a nonjury case, a notice of appeal filed before the entry of the order disposing of the last pending postjudgment motion, or before the final disposition of any separate claim, becomes effective when the order disposing of said motion or claim is entered." Ill. S. Ct. R. 303(a)(1), (2) (eff. June 4, 2008).

¶ 57    On February 1, 2013, the trial court granted the Thomas defendants' motion for summary judgment. In that order, the court stated that it was considering entering a Rule 304(a) finding as to that order and directed the parties to make recommendations on that issue. On February 12, 2013, the court made a Rule 304(a) finding and stated that there was no just reason for delaying either enforcement or appeal, or both, of the court's February 1, 2013, order. Angela filed a motion to vacate the court's Rule 304(a) finding and a motion to reconsider. On March 18, 2013, the court denied Angela's motion to reconsider and granted her motion to vacate the Rule 304(a) finding. The court entered judgment on the jury's verdict on March 28, 2014. Thereafter, Angela and the Balagani defendants filed posttrial motions. On July 17, 2014, Angela filed her notice of appeal seeking review of the court's summary judgment order. The court disposed of the posttrial motions on September 9, 2014.

¶ 58    The Thomas defendants argue that Angela's notice of appeal filed on July 17, 2014, was ill-timed because it was filed more than 30 days after the entry of the jury's verdict on March 28, 2014, and before the September 9, 2014, rulings on the last pending posttrial motions. In response, Angela argues that although her notice of appeal was premature, it became effective

25

upon the court's ruling on the posttrial motions on September 9, 2014, and was therefore timely and sufficient to confer jurisdiction upon this court.

¶ 59 Under Rule 303(a)(2), "when [a] court renders a decision on a timely filed postjudgment motion ***, a premature notice of appeal takes effect when the court enters the order disposing of the last posttrial matter." *In re Estate of Hanley*, 2013 IL App (3d) 110264, ¶ 43. Here, Angela's notice of appeal as to the Thomas defendants was premature. However, once the trial court ruled on the last pending posttrial motions on September 9, 2014, the premature notice of appeal became effective. Thus, this court has jurisdiction to consider Angela's appeal of the trial court's grant of summary judgment to the Thomas defendants. See *id.*

¶ 60 Next, the Thomas defendants argue the summary judgment issue is moot and Angela is judicially estopped from pursing her claim against the Thomas defendants. Without any citation to authority, the Thomas defendants argue this issue is moot because Angela "obtained a monetary judgment in her favor in the amount of $1.6 million, and until such time as this Court reverses that judgment and remands the matter for a new trial, the issue of summary judgment *** is moot." The Thomas defendants also argue that this issue is moot because, even if they were found liable, Angela was fully compensated. Additionally, the Thomas defendants argue that the doctrine of judicial estoppel prevents Angela from pursuing her claim against them because she went to trial with the Balagani defendants under the theory that they were liable for Donald's death. In response, Angela argues that the issue is not moot, judicial estoppel does not apply, and the Thomas defendants should be sanctioned for raising these arguments.

¶ 61 "An issue is moot when intervening events have rendered it impossible for a reviewing court to grant the complaining party effectual relief." *Wilson v. Jackson*, 312 Ill. App. 3d 1156, 1162-63 (2000). Angela's appeal of the trial court's grant of summary judgment to the Thomas

26

defendants is not moot just because other defendants were found liable for Donald's death and Angela obtained a money judgment against them. As Angela notes, even though the jury's verdict did not pertain to the Thomas defendants, they can still be held responsible if the evidence demonstrates that they were *a* cause in Donald's death. Thus, the jury's verdict is not an intervening event that has rendered it impossible for this court to grant Angela her requested relief, namely, reversal of the trial court's order granting the Thomas defendants' motion for summary judgment.

¶ 62    Nor does the jury's award of damages against OSF and Dr. Balagani moot Angela's appeal of the trial court's grant of summary judgment in favor of the Thomas defendants. The judgment entered against OSF and Dr. Balagani has not yet been satisfied. The trial court has stayed execution of the verdict and judgment entered in Angela's favor pending appeal. Thus, contrary to the Thomas defendants' argument, Angela has not yet ben "fully compensated" in this matter.  Moreover, even if additional damages cannot be awarded in any future action against the Thomas defendants (because the existing award of $1.6 million in damages would fully compensate Angela), Angela's appeal involving the Thomas defendants would not be moot because a judgment of liability against the Thomas defendants would entitle Angela to collect some or all of those damages from another party (the Thomas defendants). A reversal of summary judgment for the Thomas defendants affords Angela the opportunity to obtain a judgment against the Thomas defendants, which, if granted, could afford Angela the right to secure relief from the Thomas defendants for some or all the losses she, Donald, and her family have suffered as a result of the defendants' negligent actions or failures to act.  The opportunity to obtain such relief from the Thomas defendants constitutes meaningful and "effectual" relief regardless of whether Angela also has the ability to collect damages from other defendants.

27

Thus, it is not impossible for us to grant effectual relief to Angela by reversing the trial court's grant of summary judgment in favor of the Thomas defendants. The jury's award of damages against OSF and the Balagani defendants does not moot Angela's appeal of that issue.

¶ 63    Since we have decided that the summary judgment issue is not moot, we must next decide whether judicial estoppel prevents Angela from pursuing her claim against the Thomas defendants. Judicial estoppel is an equitable doctrine that was established to protect the integrity of the judicial process by prohibiting parties from changing their positions in accordance with the exigencies of the moment. *Seymour v. Collins*, 2015 IL 118432, ¶ 36. Judicial estoppel generally applies when a party has (1) taken two positions, (2) that are factually inconsistent, (3) in separate judicial or quasi-judicial administrative proceedings, (4) intending for the trier of fact to accept the truth of the facts alleged, and (5) the party has succeeded in the first proceeding and received some benefit from it. *Id.* ¶ 37.

¶ 64    Here, the Thomas defendants essentially argue that Angela is changing her position by challenging the trial court's summary judgment order in their favor because she proceeded to trial against the Balagani defendants and presented arguments that the Balagani defendants were responsible for Donald's death. The record is clear that Angela proceeded to trial under that theory because the trial court had already dismissed the Thomas defendants from the case. The theory that Angela presented at trial was an alternative theory that she was left with after the trial court granted summary judgment in favor of the Thomas defendants. This was not a change in position, but rather, an alternative argument. In any event, the argument Angela presented at trial was that the Balagani defendants were *a* cause of Donald's death—not the sole cause. It is not contradictory for Angela to pursue a claim against the Thomas defendants for also being *a* cause in Donald's death. Thus, judicial estoppel is inapplicable here.

28

¶ 65        Next, we address Angela's request for sanctions against the Thomas defendants. Angela argues that Rule 375(b) sanctions are appropriate for the Thomas defendants' mootness argument because the argument was made without any basis in law and the Thomas defendants failed to cite any authority to support their argument. Rule 375(b) provides, in relevant part, as follows:

"(b) Appeal or Other Action Not Taken in Good Faith; Frivolous Appeals or Other Actions. If, after consideration of an appeal or other action pursued in a reviewing court, it is determined that the appeal or other action itself is frivolous, or that an appeal or other action was not taken in good faith, for an improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation, or the manner of prosecuting or defending the appeal or other action is for such purpose, an appropriate sanction may be imposed upon any party or the attorney or attorneys of the party or parties. An appeal or other action will be deemed frivolous where it is not reasonably well grounded in fact and not warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law. An appeal or other action will be deemed to have been taken or prosecuted for an improper purpose where the primary purpose of the appeal or other action is to delay, harass, or cause needless expense." Ill. S. Ct. R. 375(b) (eff. Feb. 1, 1994).

¶ 66        A reviewing court may impose a sanction upon the motion of another party or on its own initiative. *Id.* Here, Angela did not file a proper motion with this court seeking sanctions. Rather, she merely included this request in her responsive brief. Moreover, although the Thomas defendants' mootness argument lacks merit, we do not find the argument to be frivolous. Nor do we find that the argument was brought in bad faith or for an improper purpose. Accordingly, we

29

decline to impose Rule 375(b) sanctions on our own initiative.

¶ 67    Next, we reach the merits of Angela's argument on appeal: whether the trial court erred when it granted the Thomas defendants' motion for summary judgment. The trial court's ruling on a motion for summary judgment is a question of law, which we review *de novo*. *Willie Pearl Burrell Trust v. City of Kankakee*, 2016 IL App (3d) 150398, ¶ 10. Summary judgment is not appropriate when: (1) material facts are disputed; (2) reasonable people could draw diverging inferences from the undisputed material facts; or (3) reasonable people could differ on the weight given to relevant factors of a legal standard at issue. *Seymour*, 2015 IL 118432, ¶ 42.

¶ 68    Angela argues that the trial court erred in granting the Thomas defendants' motion for summary judgment on the basis that Dr. Thomas, as an on-call physician, did not owe Donald a duty of care. Angela maintains that a physician-patient relationship existed between Dr. Thomas and Donald which gave rise to a duty of care.   For the following reasons, we agree with Angela.

¶ 69    This court recently addressed whether "on-call" physicians owe a duty of care to patients for whom attending physicians seek input from the on-call physician. *Mackey v. Sarroca,* 2015 IL App (3d) 130219. In *Mackey*, the court began its analysis by noting, "[t]he central inquiry is whether the [on-call] physician has been asked to provide a specific service for the benefit of a specific patient." *Id.* ¶ 20. The *Mackey* court examined the facts surrounding the duties and responsibilities of the "on-call" physician to determine whether there were indicia that he provided specific service for the benefit of a specific patient. *Id.* ¶ 26. Those indicia included: (1) whether the consultation was part of established procedures, protocols, or contractual obligations with the hospital as opposed to an informal or *ad hoc* basis; (2) whether the on-call physician (or his employer) was compensated for his services; (3) whether the on-call physician ordered or interpreted test results; (4) whether the on-call physician gave medical advice regarding the

30

subject patient's care; and (5) whether the on-call physician made decisions regarding the patient's care. *Id.* ¶¶ 26-27.

¶ 70    In this case, the trial court focused only on the length of the telephone contact between Drs. Thomas and Bolton. The court then determined, as a matter of "public policy," that the duration of the contact between Drs. Thomas and Bolton was insufficient to establish a duty of care. The court granted summary judgment on that basis.

¶ 71    After considering the factors articulated in *Mackey,* we conclude that the trial court erred in finding that Dr. Thomas owed no duty of care to Donald. The record established that Dr. Thomas was designated by OSF as the on-call hematologist physician, and as such, was in a position to expect to be called upon to render guidance and assistance in treating specific patients at OSF. The record further established that the on-call relationship that Dr. Thomas had with OSF, through his employer Oncology-Hematology Associates of Central Illinois, was part of a formalized patient care regime at OSF where treating/attending physicians were expected to contact an on-call specialist for consultation and guidance regarding specific patients as the need arose at OSF. The record also established that Thomas's duty, as the on-call hematologist physician, included going to the hospital to render assistance in treatment if deemed necessary. It is evident that Dr. Thomas provided a specific service to a specific patient (Donald). Dr. Thomas's consultations were followed pursuant to OSF's protocol and other contractual obligations Dr. Thomas's employer had with OSF. Dr. Thomas interpreted test results and gave medical advice to Dr. Bolton regarding Donald's care, he was compensated for his consultation, and he was expected to come to the hospital to render treatment if it was deemed necessary.

¶ 72    Given these facts, it is clear that the indicia of a duty of care articulated by this court in *Mackey* were present in this case. Thus, the trial court erred as a matter of law when it found

31

that the Thomas defendants owed no duty of care to Donald and granted summary judgment in their favor. We reverse the trial court's order granting the Thomas defendants' motion for summary judgment and remand for further proceedings on Angela's claims against the Thomas defendants.

¶ 73                    B. Angela's Motion for a New Trial

¶ 74        Next, Angela argues that the trial court abused its discretion when it denied her motion for a new trial on damages only. Specifically, Angela argues the jury's award of only $500,000 for loss of society was grossly inadequate to compensate her and Donald's four children, three of whom were minors at the time of Donald's death, for the loss of Donald's society.

¶ 75        Upon a finding of liability for a wrongful death, the jury must "fix the amount of money which will reasonably and fairly compensate the lineal next of kin * * * for the pecuniary loss proved by the evidence." IPI Civil (2007), No. 31.04; see also *Dobyns v. Chung*, 399 Ill. App. 3d 272, 286 (2010). This may include the loss of money, benefits, goods, services, sexual relations, and "society." IPI Civil (2007), No. 31.04. "Society" means "the mutual benefits that each family member receives from the other's continued existence, including love, affection, care, attention, companionship, comfort, guidance, and protection." IPI Civil (2007), No. 31.11; *Dobyns*, 399 Ill. App. 3d at 287. Where a decedent leaves lineal next of kin, the law recognizes a presumption that the lineal next of kin have sustained some "substantial" pecuniary loss by reason of the death. IPI Civil (2007), No. 31.04); *Dobyns*, 399 Ill. App. 3d at 286-87; *Cooper v. Chicago Transit Authority*, 153 Ill. App. 3d 511, 518-19 (1987). The weight to be given this presumption is for the jury to decide from the evidence presented in the case, including, *inter alia*, evidence of the decedent's past and future contributions, the decedent's habits of industry and thrift, the children's loss of future instruction, moral training, and superintendence of

32

education as a result of the decedents death, and the descendants' grief, sorrow, and mental suffering and their relationship with the decedent. IPI Civil (2007) No. 31.04; *Dobyns*, 399 Ill. App. 3d at 287.

¶ 76     The amount of damages to be assessed is a question of fact for the jury to determine. *Snelson v. Kamm*, 204 Ill. 2d 1, 36 (2003). Thus, great weight is given to the jury's decision on damages. *Id.* at 36-37. Generally, a decision as to whether to grant a new trial is a matter left to the sound discretion of the court, and the court's determination will not be overturned on review absent an abuse of discretion. *Wade v. Rich*, 249 Ill. App. 3d 581, 587 (1993). However, a jury's verdict may be set aside and a new trial ordered where the amount of damages is palpably inadequate or against the manifest weight of the evidence, where the jury has clearly disregarded a proven element of damages, or where the award bears no reasonable relationship to the loss suffered. *Wade*, 249 Ill. App. 3d 5at 587; *Racky v. Belfor USA Group, Inc.*, 2017 IL App (5th) 153446, ¶ 127; see also *Snelson*, 204 Ill. 2d at 37. A judgment is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the jury's findings are unreasonable, arbitrary, and not based on the evidence. *Racky*, 2017 IL App (5th) 153446, ¶ 127; *1472 N. Milwaukee, Ltd. v. Feinerman*, 2013 IL App (1st) 121191, ¶ 13.

¶ 77     The jury's award of $500,000 was manifestly inadequate to compensate Angela and Donald's four children for the loss of Donald's companionship and society. Donald was only 48 years old at the time of his death. He was active and physically fit, and he had no chronic health conditions before his hospitalization for HA in September 2009. He and Angela had been happily married for 19 years, and their three children were minors when Donald died. Angela's and the children's unrebutted testimony established that Donald was a loving and devoted husband and father who was actively involved in his children's lives. Angela testified that she

33

and Donald had been together for 24 years and they had a "wonderful relationship." She described Donald as her "best friend," her "soul mate," and the man she was going to live with for the rest of her life. Angela and Donald got along very well and were "together all the time." Angela also stated that Donald was very involved in the lives of each of his children. Donald had an adult daughter, Keri, from a previous marriage. Donald helped Keri through college and he and Angela babysat Keri's young daughter every weekend while Keri had to work as a waitress. Angela testified that Donald had a special relationship with each of his children, he made time for each child, and he was "always doing special things for each one of them." He taught them right from wrong, was "definitely" "very active" in their moral upbringing, helped them with their homework and sports, and "was always making them laugh." He coached his son Braden's baseball and soccer teams and went fishing and golfing with him. Shortly after Donald's death, Braden earned a college scholarship to play baseball, but he ended up declining the scholarship and attending another college closer to home because he felt that he needed to be with his family and take care of his mother and sisters. Angela testified that Donald was their daughter Emilee's "best friend," and that he always held and took care of his youngest daughter, Samantha, whom Angela described as Donald's "baby."

¶ 78    Keri McIntyre Harvey, Donald's adult daughter from a previous marriage, testified that Donald was "[p]robably the best man" that she had ever known. Donald helped Keri financially, fixed things around her house, and took care of Keri's young daughter when Keri had to work as a waitress. Keri saw Donald multiple times per week and Donald was "always helping" Keri, her daughter, and the family. Keri described her father as her friend, and she stated that she thinks of him every day. She was at the hospital when her father died. Keri regretted that Donald had missed her wedding and other important events in the lives of his children. Keri also

34

testified that Donald and Angela were passionately in love and were planning to take a trip to celebrate their twentieth wedding anniversary at the time of Donald's death.

¶ 79    Braden McIntyre, Angela and Donald's son, was 16 years old when Donald died. On the night Donald died, Braden helped Angela tell his younger sisters about their father's death. Braden testified that, prior to his death, Donald had been very involved in coaching and supporting Braden's sports teams (especially baseball) and that he had convinced Braden not to quit playing baseball. Braden also stated that Donald had taught him "how to be in a job and become a man." He testified that his father was his "best friend." At the time of the hearing, Braden was attending college near his mother's home and was helping his mother and sisters as much as he could. He was playing baseball at college.

¶ 80    Emilee McIntyre, Angela and Donald's elder daughter, was twelve years old when Donald died. Emilee testified that the McIntyres were a very close family and that Donald was "like a best friend" who coached all of the children's sports teams, helped Emilee with her school work (especially math), took the children to games and played with them often. She described Donald as an "active and fun" person who "joked about everything." Emilee regretted that her father did not live to see her graduate from the eighth grade or learn to drive.

¶ 81    Samantha McIntyre, Donald and Angela's younger daughter, was eleven years old when Donald died. Donald helped Samantha with her math homework and coached her basketball and softball teams. Donald also helped Samantha with her pitching and practiced with her at home until she became a "really good" pitcher. (Donald also coached Emilee in basketball and softball.) Samantha stated that Donald was "so funny" and always know how to make her and the other children laugh. She said that she no longer laughs as much since her father's death.

¶ 82    Neither Samantha nor any of the children were estranged from Donald at the time of his

death.  To the contrary, each of them was very close to Donald.  By all accounts, Donald was a loving, caring, and dedicated father who was very involved in all aspects of his children's lives (educational, athletic, moral, recreational).  The defendants presented no evidence to rebut Angela's or the children's testimony on these matters.  Thus, the unrebutted testimony clearly established that Angela and the children suffered a substantial loss as a result of Donald's untimely death.  Under the circumstances presented in this case, the jury's award of $500,000 bore no reasonable relationship to the family members' loss of Donald's society (including his guidance and loving support as a devoted husband and father) or the pain and grief they suffered as a result.  We are mindful of the deference owed to a jury's damages verdict and we are normally reluctant to overturn such a verdict.  Given the unrebutted evidence presented in this case, however, we find the jury's verdict to be palpably inadequate and against the manifest weight of the evidence.  To find that $500,000 (divided among the five survivors) is adequate compensation for the loss of Donald's society would be to trivialize the devastating impact Donald's death had on his family.  We therefore reverse the damages verdict for loss of society and remand for a new trial on that issue.[4]

¶ 83                          C. The Balagani Defendants' Motion To Supplement Record

¶ 84          Angela also argues that the trial court erred as a matter of law when it granted the Balagani defendants' motion to supplement the record on appeal.  The parties dispute the standard of review that governs our analysis of this issue.  Angela argues that we should review

---

[4] We may remand for a new trial on loss of society damages without ordering a new trial on the Balagani defendants' liability in this case because: (1) the jury's verdict on the Balagani defendants' liability is clear and amply supported by the evidence; (2) the questions of damages and liability are sufficiently separate and distinct that a new trial on damages only would not be unfair to the defendants; and (3) the record does not suggest that the jury reached a compromise verdict or that the error which resulted in the jury's awarding inadequate damages also affected the jury's finding on liability.  See, *e.g.*, *Cimino v. Sublette*, 2015 IL App (1st) 133373, ¶ 111; *Decker v. St. Mary's Hospital*, 249 Ill. App. 3d 802, 816 (1993).

the trial court's ruling *de novo*, whereas the Balagani defendants argue that the abuse of discretion standard applies.

¶ 85    We agree with the Balagani defendants.  This issue does not present a pure matter of statutory construction.  Rather, it requires us to review the trial court's attempt to "correct" "material omissions or inaccuracies" in the record pursuant to Illinois Supreme Court Rule 329 (eff. Jan. 1, 2006). We review the trial court's decision on this issue for abuse of discretion.  See *Joseph D. Foreman & Co. v. Neri*, 6 Ill. App. 3d 313 (1972).  As noted, an abuse of discretion occurs when the trial court's ruling is arbitrary, fanciful, or unreasonable or where no reasonable person would adopt its view. *Pavnica*, 401 Ill. App. 3d at 740.

¶ 86    Although the Illinois Supreme Court rules expressly allow supplementation only with "original" documents, in this case, the court clerk failed to include the original document of the numbered jury instructions in the record and then lost or misplaced that document. (The clerk was unable to locate the original document until long after the record on appeal was filed.) Angela does not dispute the accuracy of the numbered jury instructions submitted by the Balagani defendants in their motion to supplement the record or argue that the set of jury instructions included in Angela's counsel's file differs in any way from the set submitted by the Balagani defendants. Thus, the numbered jury instructions do not add any substantive evidence to the case. The transcripts show that the instructions submitted by the Balagani defendants were given to the jury. The sole purpose of the written numbered instructions submitted by the Balagani defendants in their motion to supplement the record was to make the transcript of the jury instruction conference intelligible. Angela never questioned the accuracy of the instructions submitted by the defendants or the numbering of the instructions.

¶ 87    Nonetheless, Angela argues that the Balagani defendants waived their right to supplement

37

the record due to their lack of diligence. The Balagani defendants sought multiple extensions of time in which to file their posttrial motions and then sought multiple extensions of time in which to file their briefs on appeal. However, they did not notice the missing jury instructions or move to supplement the record until two days before the final deadline to file their appellate briefs. Nevertheless, under the circumstances presented in this case, we cannot say that the trial court's decision to allow motion was contrary to law or an abuse of discretion.

¶ 88                           II. The Balagani Defendants' Appeal

¶ 89        The Balagani defendants argue that they are entitled to a new trial on liability. They contend that the trial court committed reversible error by: (1) barring Dr. Bolton from testifying as to the content of her telephone conversation with Dr. Thomas on hearsay grounds; and (2) barring evidence that Dr. Thomas had breached the applicable standard of care, thereby improperly depriving the Balagani defendants of their main defense (*i.e.*, the argument that Dr. Thomas's negligence was the sole proximate cause of Donald's death). The Balagani defendants also argue that the jury's liability verdict was against the manifest weight of the evidence. Further, the Balagani defendants maintain that the jury erred when it awarded Angela $1.1 million for lost future income. Because OSF raises this same argument regarding lost future income on appeal, we will address it with OSF's appeal below.

¶ 90                                     A. Hearsay

¶ 91        As an initial matter, Angela argues that the Balagani defendants have forfeited their hearsay argument by not raising it in their posttrial motion. We disagree. The Balagani defendants argued in their posttrial motion that the trial court's hearsay ruling was "error" and that the testimony at issue fell within an unspecified hearsay exception. There is some question whether these vague and skeletal arguments were sufficiently specific to preserve the issue for

appeal, particularly considering that the Balagani defendants' hearsay argument on appeal seems to be somewhat different from the argument raised below. See *People v. Williams*, 193 Ill. 2d 306, 347 (2000); *People v. Beasley*, 307 Ill. App. 3d 200, 207-08 (1999). However, forfeiture is an admonition to the parties rather than a limitation on this court's jurisdiction, and it may be relaxed where the interests of justice so require. *Texaco-Cities Service Pipeline Co. v. McGaw*, 182 Ill. 2d 262, 279 (1998); *Lake County Grading Company, LLC v. Forever Construction Company, Inc.*, 2017 IL App (2d) 160359, ¶ 42; *Kimble v. Illinois State Board of Education*, 2014 IL App (1st) 123436, ¶ 80; see also *Niles Township High School District 219 v. Illinois Educational Labor Relations Board*, 369 Ill. App. 3d 128, 137 (2006). In the case at bar, we find that the interests of justice require us to consider the Balagani defendants' hearsay argument.

¶ 92    We conclude that the trial court erred in ruling that the testimony at issue was hearsay and by excluding the testimony on that ground. "Hearsay" is a statement, other than a statement made by the declarant while testifying at the trial or hearing, offered into evidence to prove the truth of the matter asserted. Ill. R. Evid. 801(c) (eff. Jan. 1, 2011); see also *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 99 (1995). An out-of-court statement offered into evidence for some purpose other than to prove the truth of the matter asserted is not hearsay. *People v. Kliner*, 185 Ill. 2d 81, 150 (1998). For example, suppose that witness A testifies that "B told me that event X occurred." If A's testimony is offered for the purpose of establishing *that B said this*, it is clearly admissible. *Leonardi*, 168 Ill. 2d at 99. However, if offered to prove that event X occurred, it is inadmissible. *Id.* Similarly, an out-of-court statement offered to prove its effect on a listener's mind or to show why the listener subsequently acted as he did is not hearsay and is admissible. *Fakes v. Eloy*, 2014 IL App (4th) 121100, ¶ 124; see also *Leonardi*, 168 Ill. 2d at 99; *In re Marriage of Roepenack*, 2012 IL App (3d) 110198, ¶ 44, abrogated on

39

other grounds by *Warren County Soil & Water Conservation District v. Walters*, 2015 IL 1177832.

¶ 93 Here, the trial court erred in excluding as hearsay Dr. Bolton's testimony regarding what Dr. Thompson told her about Donald's care. This testimony was not offered to prove the truth of any factual matter asserted by Dr. Thomas (*e.g.*, that Dr. Thomas' treatment recommendations were correct or medically sound). Rather, it was offered to show the effect of Dr. Thomas's statements upon Drs. Bolton and Balagani, *i.e.*, to show why they subsequently acted as they did. It could be argued that the statements were also offered to show that Dr. Thomas made certain particular statements or treatment recommendations, *e.g.*, Dr. Thomas recommended that no further transfusions of O-negative blood be given. But that would also constitute an admissible, non-hearsay purpose. *Leonardi*, 168 Ill. 2d at 99.

¶ 94 Thus, the trial court erred as a matter of law in finding the testimony at issue to be hearsay, and, therefore, abused its discretion by excluding the testimony on hearsay grounds. See *Peeples v. Village of Johnsburg*, 403 Ill. App. 3d 333, 339 (2010) ("A trial court abuses its discretion *** where its ruling rests on an error of law"). However, even when an abuse of discretion has occurred, we will not reverse the trial court's judgment on an evidentiary issue unless "the record indicates the existence of substantial prejudice affecting the outcome of the trial." *In re Leona W.*, 228 Ill. 2d 439, 460 (2008); *Guski v. Raja*, 409 Ill. App. 3d 686, 698 (2011); *Roepenack*, 2012 IL App (3d) 110198, ¶ 44. Accordingly, the dispositive question is whether the trial court's erroneous refusal to admit the evidence at issue resulted in "substantial prejudice affecting the outcome of the trial," and is therefore reversible. *Leona W.*, 228 Ill. 2d at 460; see also *Guski*, 409 Ill. App. 3d at 698; *Roepenack*, 2012 IL App (3d) 110198, ¶ 44.

¶ 95 In this case, the trial court's error was not outcome determinative, for several reasons.

40

First, Dr. Bolton was allowed to testify about her "understanding" of the treatment plan based upon her consultation with Dr. Thomas, and she explicitly testified that the treatments she ordered were "based on Dr. Farrell and Dr. Thomas' recommendations." Thus, the Balagani defendants got the crux of their defense before the jury, even if Dr. Bolton was barred from testifying specifically about what Dr. Thomas had told her. Moreover, the Balagani defendants could have obviated the trial court's erroneous hearsay ruling by calling Dr. Thomas and asking him what he said to Dr. Bolton. If Dr. Thomas denied telling Dr. Bolton to stop transfusing O-negative blood, as he did in his supplemental deposition, defense counsel could have impeached him with his contrary statement in his initial deposition. However, defense counsel chose not to do so, presumably for strategic reasons. Further, Dr. Bolton did not note in Donald's medical chart that Dr. Thomas told her to stop transfusing O-negative blood. Her entry in the chart reflects that *Dr. Balagani* gave that order, and does not mention Dr. Thomas. Based on that evidence, the jury could have reasonably chosen not to believe Dr. Bolton's account of what Dr. Thomas had told her (assuming that Dr. Bolton's testimony contradicted her entry in the chart), even if she had been allowed to testify fully on that issue. Moreover, in response to questioning by defense counsel, Dr. Abrams and Dr. DeBoisblanc each reviewed the discovery depositions of Dr. Thomas, and each testified that Dr. Thomas had recommended steroids and IVIG, and apparently never told Dr. Bolton not to give blood (as Dr. Thomas had understood that the defendants were continuing to give blood). The jury could have reasonably credited this testimony. Accordingly, the trial court's erroneous hearsay ruling was harmless.

¶ 96                                B. The "Sole Proximate Cause" Defense

¶ 97        The Balagani defendants also argue that the trial court erred by improperly barring them from presenting evidence that Dr. Thomas had breached the standard of care, which effectively

41

prevented them from arguing that Dr. Thomas was the "sole proximate cause" of Donald's death. The defendants correctly note that, because they denied in their answer that their own conduct was a cause of Donald's death, they had a right to present evidence that Donald's death was solely the result of another cause, even if that cause was the conduct of another party not named as a defendant in the lawsuit. *Leonardi*, 168 Ill. 2d at 93-95. The question is whether the trial court's rulings in this case barred the defendants from presenting such evidence.

¶ 98        In granting Angela's motion *in limine*, the trial court apparently initially barred the Balagani defendants from suggesting that Dr. Thomas breached the standard of care, was negligent, or was a proximate cause of Donald's death. Subsequently, however, the trial court clarified that the Balagani defendants could present evidence suggesting that Dr. Thomas was the sole proximate cause of Donald's death if they laid a foundation for such evidence by either presenting an expert opinion to that effect or by presenting evidence that they relied on Dr. Thomas's advice in rendering treatment to Donald.  Defense counsel was subsequently allowed to question expert witnesses, including Drs. Abrams and DeBoisblanc, about their understanding of Dr. Thomas's treatment recommendations and the role of those recommendations in Donald's treatment.  Several of the medical experts testified that it was reasonable and to be expected that Drs. Balagani and Bolton would rely upon Dr. Thomas's recommendations in this case.  In addition, although Dr. Bolton was not allowed to testify as to what Dr. Thomas said to her, she was allowed to state that the Balagani defendants' treatment of Donald was based upon Dr. Thomas's recommendations. Further, during closing argument, Dr. Balagani's counsel argued that Angela's own experts suggested that it was reasonable for Drs. Bolton and Balagani to rely upon the consulting specialists and that those experts felt that the directions provided by Dr. Thomas "was the cause of Donald's death." Accordingly, contrary to the Balagani defendants'

argument, they were not barred from suggesting to the jury that Dr. Thomas's conduct was the sole proximate cause of Donald's death.

¶ 99   The Balagani defendants appear to assume that the fact that they were barred from suggesting that Dr. Thomas *breached the standard of care* or *was negligent* precluded them from arguing that Dr. Thomas's treatment recommendations were the sole proximate cause of Donald's death. We disagree. Proximate causation is a separate issue from negligence or breach of duty, and the former may be proven without evidence of the latter. As noted, the defendants were allowed to, and did, present evidence suggesting that Dr. Thomas was the sole proximate cause of Donald's death.

¶ 100                    C. Whether the Jury Verdict Is Contrary to Law or
                            Against the Manifest Weight of the Evidence

¶ 101   The Balagani defendants argue that the trial court erred by denying their motions for judgment notwithstanding the verdict (JNOV) or a new trial based on the paucity of the evidence against them. A judgment notwithstanding the verdict (JNOV) is properly entered in those limited cases where all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand. *Maple v. Gustafson*, 151 Ill. 2d 445, 453 (1992). In ruling on a motion for JNOV, a court does not weigh the evidence, nor is it concerned with the credibility of the witnesses; rather it may only consider the evidence, and any inferences therefrom, in the light most favorable to the party resisting the motion. *Id.* A JNOV may not be granted merely because a verdict is against the manifest weight of the evidence. *Id.* Alternatively, "[o]n a motion for a new trial a court will weigh the evidence and set aside the verdict and order a new trial if the verdict is contrary to the manifest weight of the evidence." *Id.* at 454. "A verdict is against the manifest weight of the evidence where the opposite conclusion is clearly evident or

43

where the findings of the jury are unreasonable, arbitrary and not based upon any of the evidence." *Id.*; see also *Redmond v. Socha*, 216 Ill. 2d 622, 651 (2005). We review a trial court's denial of a motion for JNOV *de novo. Ford v. Grizzle*, 398 Ill. App. 3d 639, 650 (2010). The standard of review of a trial court's denial of a motion for a new trial is whether the jury's verdict was against the manifest weight of the evidence. *Friedman by Friedman v. Park Dist. of Highland Park*, 151 Ill. App. 3d 374, 385 (1986).

¶ 102    The Balagani defendants argue that they are entitled to a JNOV or a new trial because: (1) all of the experts agreed that Donald's rare condition was outside the expertise of an ICU doctor and that it was reasonable for Drs. Balagani and Bolton to rely upon Dr. Thomas's advice; (2) no expert testified that Drs. Balagani and Bolton violated the standard of care by ignoring or failing to follow Dr. Thomas's treatment recommendations. Accordingly, the Balagani defendants maintain that, based on the evidence presented, the jury could not possibly have found that Drs. Balagani or Bolton breached the standard of care. The defendants argue that, at a minimum, the jury's liability verdict is against the manifest weight of the evidence and they are entitled to a new trial.

¶ 103    Contrary to the Balagani defendants' argument, some of the experts opined that the ultimate decision regarding Donald's treatment rested with Dr. Balagani, not the consulting physicians, and that Drs. Balagani and Bolton should have known how to treat Donald's condition. Moreover, even if the jury found that Drs. Balagani and Bolton could have reasonably relied upon Dr. Thomas's recommendations, there was evidence suggesting that Dr. Thomas never advised Dr. Balagani or Dr. Bolton not to transfuse more O-negative blood. (Drs. Abrams and DeBoisblanc testified to that effect based on Dr. Thomas's discovery deposition, and Dr. Bolton's medical chart notation stated that *Dr. Balagani* ordered no more blood transfusions but

44

did not mention that Dr. Thomas had issued any such order or recommendation.) Accordingly, there was sufficient evidence in the record to support the jury's verdict that the Balagani defendants were negligent and were liable for Donald's death.

¶ 104                                    III. OSF's Appeal

¶ 105        On appeal, OSF argues that: (1) it was entitled to a JNOV or, alternatively, a new trial on whether Dr. Balagani was an apparent agent of OSF; (2) Angela presented no competent evidence of loss of future income and the trial court erred in denying its posttrial motion to remit the jury's award for lost future earnings (as the Balagani defendants also argue); and (3) the jury's erroneous apportionment of liability between OSF and Dr. Balagani rendered its verdict against OSF on grounds of apparent agency "inconsistent," "legally incomprehensible," and against the manifest weight of the evidence. We address each of these arguments in turn.

¶ 106                                   A. Apparent Agency

¶ 107        The jury found that OSF was liable for Dr. Balagani's negligence because Dr. Balagani acted as OSF's apparent agent when he rendered treatment to Donald. OSF argues on appeal that it is entitled to a JNOV or, alternatively, a new trial on the issue of whether Dr. Balagani was an apparent agent of OSF. As noted above, a JNOV is properly entered "in those limited cases where 'all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand.' " *Maple*, 151 Ill. 2d at 453, quoting *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967)). In ruling on a motion for JNOV, a court does not weigh the evidence, nor is it concerned with the credibility of the witnesses; rather it may only consider the evidence, and any inferences therfrom, in the light most favorable to the party resisting the motion. *Maple*, 151

45

Ill. 2d at 453. A JNOV may not be granted merely because a verdict is against the manifest weight of the evidence. *Id.* We review the trial court's denial of a motion for JNOV *de novo*. *Ford*, 398 Ill. At 650. By contrast, a motion for a new trial should be granted when jury's verdict is against the manifest weight of the evidence, *i.e.*, if the opposite conclusion is clearly evident or the jury's findings are unreasonable, arbitrary, or not based on the evidence (*Maple*, 151 Ill. 2d at 453; see also *Buckholtz v. MacNeal Hospital*, 337 Ill. App. 3d 163, 168 (2003)), and it is that standard that guides our review of the trial court's denial of a motion for a new trial (*Friedman by Friedman*, 151 Ill. App. 3d at 385).

¶ 108     A hospital may be vicariously liable for negligent medical treatment rendered in the hospital by an independent-contractor physician under the doctrine of apparent authority if the plaintiff establishes that: "(1) the hospital, or its agent, acted in a manner that would lead a reasonable person to conclude that the individual who was alleged to be negligent was an employee or agent of the hospital; (2) where the acts of the agent create the appearance of authority, the plaintiff must also prove that the hospital had knowledge of and acquiesced in them; and (3) the plaintiff acted in reliance upon the conduct of the hospital or its agent, consistent with ordinary care and prudence." (Internal quotation marks omitted.) *Gilbert v. Sycamore Municipal Hospital*, 156 Ill. 2d 511, 525 (1993).

¶ 109     The first two elements are frequently grouped together and have been referred to as the "holding out" factor. The element of "holding out" is satisfied if the hospital holds itself out as a provider of emergency room care without informing the patient that the care is provided by independent contractors. *Id.* Hospitals increasingly hold themselves out to the public in expensive advertising campaigns as offering and rendering quality health services. *Id.* at 520. Moreover, the element of justifiable reliance on the part of the plaintiff is satisfied if the plaintiff

46

or those responsible for his care (such as paramedics or a parent or other relative if the patient is a minor or an incapacitated adult) rely upon the hospital to provide complete emergency room care, rather than upon a specific physician. *Id.* at 525. The public is generally unaware of whether the staff in an emergency room is comprised of independent contractors or employees of the hospital, and absent a situation where a patient is somehow put on notice of a doctor's independent status, a patient generally relies on the reputation of the hospital and reasonably assumes that the staff is comprised of hospital employees. *Id.* at 521.

¶ 110      Although *Gilbert* involved an emergency room setting, the *Gilbert* analysis is not limited to such situations. See, *e.g.*, *Malanowski v. Jabamoni*, 293 Ill. App. 3d 720 (1997) (applying *Gilbert* in an outpatient clinic setting). However, liability attaches to the hospital only where the treating physician is the apparent or ostensible agent of the hospital. If the patient knows, or should have known, that the treating physician is an independent contractor, then the hospital will not be liable. *Gilbert*, 156 Ill. 2d at 522.

¶ 111      OSF argues that it is entitled to a JNOV or a new trial in this case because Angela failed to present any evidence, other than "speculation and conjecture," suggesting that Dr. Balagani was an apparent agent of OSF or that either Angela or Donald justifiably relied upon any conduct by OSF or Dr. Balagani suggesting an agency relationship. Contrary to OSF's argument, Angela proved all of the elements required to establish that Dr. Balagani was OSF's apparent agent. OSF held itself out to the public as providing intensive medical care services without informing Donald that the care was provided by independent contractors. Moreover, Donald and those others responsible for his care, such as the paramedics who took him to OSF by ambulance, relied upon OSF to provide complete intensive care services, rather than upon a specific physician. Donald did not know that Dr. Balagani was not an employee of OSF and did not

47

choose Dr. Balagani, or any other particular physician, as his doctor; rather, OSF provided Dr. Balagani as the head of the ICU that day. Because Angela alleged that it was OSF that did the "holding out," not Dr. Balagani, Angela was not required to show that OSF acquiesced in any acts of "holding out" by Dr. Balagani. The jury was properly instructed on this issue by means of the applicable Illinois pattern jury instruction, and OSF did not object to the instruction given or tender an alternative instruction. Thus, the jury's finding of apparent agency was neither contrary to law nor against the manifest weight of the evidence.

¶ 112                                    B. Jury's Award for Lost Future Income

¶ 113        The OSF and Balagani defendants challenge the jury's award of damages of $1.1 million for the loss of Donald's future income. They maintain that Angela presented no competent evidence of lost future earnings in this case "other than speculation" that Donald's two-year old business "appeared to be improving." The defendants characterize this evidence as a "compete failure of proof" on the issue of lost future income. Accordingly, the defendants argue that the trial court erred in instructing the jury on loss future income, that they should be granted a JNOV as to lost future income damages, and that all damages for lost future earnings must be remitted from the verdict. In the alternative, they argue that the jury's damages award for lost future income was against the manifest weight of the evidence.

¶ 114        The defendants base their arguments primarily on the so-called "new business rule," which Illinois courts have applied in some contract or business tort cases wherein a plaintiff claims damages resulting from the loss of a new business or an unrealized business opportunity. The "new business rule" precludes expert witnesses from speculating about possible lost profits in such cases "where there is no historical data to demonstrate a likelihood of future profits." *Meriturn Partners, LLC v. Banner & Witcoff, Ltd.*, 2015 IL App (1st) 131883, ¶ 23.  Courts

48

applying this rule allow recovery for "profits lost due to a business interruption or tortious interference with a contract," but they require that "the business must have been established before the interruption so that the evidence of lost profits is not speculative." *SK Hand Tool Corp. v. Dresser Industries, Inc.*, 284 Ill. App. 3d 417, 427 (1996); see also *Meriturn Partners*, 2015 IL App (1st) 131883, ¶ 23. The reason for the rule is that a new business has yet to show what its profits actually are. *SK Hand Tool Corp.*, 284 Ill. App. 3d at 427. Moreover, "[a]s lost profits are frequently the result of several intersecting causes, the plaintiff must show with reasonable certainty that the defendant's conduct caused a specific portion of the lost profits." *Id.* Applying these standards, the defendants argue that the plaintiff was precluded from recovering damages for any lost future profits from Donald's business because there was insufficient evidence to support any specific growth projections of the business. The historical profit data was limited, it showed modest growth in 2008 and decreased growth in 2009, and the plaintiff never called her disclosed expert economist who could have established more specific and less speculative growth projections.

¶ 115          Contrary to the defendants' argument, however, the "new business rule" does not govern the determination of damages in this case. This is a wrongful death personal injury case, not a business tort or breach of contract case. Unlike the plaintiffs in the business tort cases cited by the defendants, Angela did not merely seek damages resulting from the lost profits of the defendant's new business; rather, she sought a much broader category of damages. Specifically, she sought damages for the "pecuniary loss" caused to her and to Donald's lineal next of kin as a result of Donald's wrongful death. The determination of damages for this type of loss is guided by IPI Civil (2007) No. 31.04, the pattern instruction given to the jury in this case, which provides that "[p]ecuniary loss" from a wrongful death "may include loss of money, benefits,

49

goods, services, [and] society [and sexual relations]." IPI 31.04. There is a presumption that Donald's lineal next of kin have sustained "some substantial pecuniary loss" by reason of his death. *Id.* In determining pecuniary loss, the jury may consider what the evidence shows concerning the money, benefits, goods, and services the decedent "customarily contributed in the past" and "was likely to have contributed in the future." *Id.* In making that determination, the jury could consider the decedent's age, sex, health, occupational abilities, and "habits of industry, sobriety, and thrift." *Id.* In order to be compensated for future loss of earnings, "[i]t is not necessary to establish an earnings history at the time of injury." *Fakhoury by Fakhoury v. Vapor Corp.*, 154 Ill. App. 3d 531, 539 (1987). "A youth with no earnings history should not be precluded from proving the future earning impact of his impairment in terms of his career ambitions." *Id.*

¶ 116        The question of damages is one of fact, and courts "are reluctant to interfere with the discretion of the jury in its assessment of damages." *SK Hand Tool Corp.*, 284 Ill. App. 3d at 426. Although a damages award for lost future earnings will not be sustained if it is based on speculative or conjectural testimony, where such an award finds its basis in testimony delivered with reasonable certainty, it must be upheld. *Id.*; see also *Fakhoury by Fakhoury*, 154 Ill. App. 3d at 539. Expert testimony is not required to establish a plaintiff's entitlement to lost future earnings. *Antol v. Chavez-Pereda*, 284 Ill. App. 3d 561, 573 (1996); *Tracy v. Village of Lombard*, 116 Ill. App. 3d 563, 575 (1983).

¶ 117        In this case, the evidence was sufficient to support the jury's damages award of $1.1 million for loss of future income, money, goods, and services. Through the testimony of Angela, Donald's widow, his former co-worker Tim Kruger, and his accountant and friend Curtis Wardelman, Angela presented ample evidence of Donald's industriousness, initiative, ingenuity,

50

and occupational abilities, including his ability to solicit clients and build and grow a business enterprise. The witness testimony suggested that Donald was a hard worker who had always been a good provider. He was reliable, responsible in his work, and he was methodical in growing his business. There was evidence that his business was growing, which the defendants did not dispute. Although the business had not yet achieved a high level of annual profits by the time of Donald's death, the business had only been operating for two years at that time and Donald had recently made large capital investments in new printing equipment to grow the business and to meet the increased demands of his growing client base. Thus, the jury could reasonably have inferred that the business would continue to grow and yield higher profits in the ensuing years. Moreover, the jury was not required to base its damages award entirely on Donald's current earnings or on a projection of the future profits generated by his upstart business alone. Rather, the jury was entitled to consider Donald's future earning potential based upon his general abilities, industriousness, work habits, and his lifetime history of providing for his family. When those factors are taken into account, it is clear that the jury's award is neither contrary to law nor against the manifest weight of the evidence.

¶ 118                    C. Jury's Apportionment of Liability

¶ 119        In the alternative, OSF argues that it is entitled to a new trial because the jury's apportionment of responsibility between OSF and Dr. Balagani rendered its verdict against OSF on grounds of apparent agency "inconsistent," "legally incomprehensible," and against the manifest weight of the evidence. As noted above, after finding Dr. Balagani liable, the jury found that OSF was derivatively liable for Dr. Balagani's negligence because Dr. Balagani was acting as OSF's apparent agent when his conduct harmed Donald. The jury then apportioned

51

fault between Dr. Balagani and OSF, finding Dr. Balagani to be 70% responsible Donald's death and OSF 30% responsible.

¶ 120　　　　As OSF correctly notes, the jury's apportionment of legal responsibility was error. The jury rejected Angela's claim of institutional negligence against OSF. Accordingly, OSF's liability in this case was predicated entirely upon Dr. Balagani's conduct and his status as an apparent agent of OSF. "When an action is brought against a master based on allegedly negligent acts of the servant and no independent wrong is charged on behalf of the master, liability is entirely derivative, being founded upon the doctrine of *respondeat superior*." *Moy v. County of Cook*, 159 Ill. 2d 519, 524 (1994); *Sperl v. C.H. Robinson Worldwide, Inc.*, 408 Ill. App. 3d 1051, 1060 (2011). A principal found to be vicariously liable is not found to be at fault but, rather, is liable only by application of the doctrine of *respondeat superior*. *American National Bank & Trust Co. v. Columbus-Cuneo-Cabrini Medical Center*, 154 Ill. 2d 347, 353-54 (1992); *Sperl*, 408 Ill. App. 3d at 1060. In such cases, there is only a basis for indemnity, not for apportionment of damages between the principal and the agent. *American National Bank & Trust Co.*, 154 Ill. 2d 347 at 353; *Sperl*, 408 Ill. App. 3d at 1060. Accordingly, the finding of an agency relationship between OSF and Dr. Balagani (and the lack of any independent act of institutional negligence performed by OSF) "eliminates the possibility of comparing conduct for purposes of apportioning liability." *Sperl*, 408 Ill. App. 3d at 1060. Because OSF's liability in this case is exclusively vicarious and derivative, fault may not be allocated between OSF and Dr. Balagani (*id.*); OSF is liable to the exact same extent that its agent, Dr. Balagani, is liable. (*Sperl v. Henry*, 2017 IL App (3d) 150097, ¶ 28, *rev'd on other grounds*, 2018 IL 123132; *Bristow v. Griffitts Construction Co.*, 140 Ill. App. 3d 191, 194 (1986); *Bean v. Missouri Pacific R.R. Co.*, 171 Ill. App. 3d 620, 625 (1988)). Put simply, OSF and Dr. Balagani are not "separate

52

tortfeasors" whose relative fault could be compared. See *Sperl*, 2017 IL App (3d) 150097, ¶ 46. Thus, the jury clearly erred by apportioning liability between OSF and Dr. Balagani.

¶ 121    However, although OSF raised the jury's apportionment error in its posttrial motion, it did not argue that the jury's verdict was irreconcilably inconsistent or suggest that OSF was entitled to a new trial based on any such inconsistency. Having failed to raise this argument in its posttrial motion, OSF has forfeited the argument on appeal. *Benford v. Everett Commons, LLC*, 2014 IL App (1st) 130314, ¶ 45.

¶ 122    In any event, even if we were to address OSF's argument for a new trial based on allegedly inconstant verdicts, we would reject it. In determining whether jury verdicts are inconsistent, a reviewing court "will exercise all reasonable presumptions in favor of the verdict or verdicts." *Redmond v. Socha*, 216 Ill. 2d 622, 643 (2005). Verdicts will not be found legally inconsistent unless they are "absolutely irreconcilable." *Id.* The verdict or verdicts will not be considered irreconcilably inconsistent if it is supported by any reasonable hypothesis. *Id.* at 644. Moreover, "only when a judgment rests on some particular finding for its validity and support will inconsistencies between two findings treating of the same essential matter necessitate a new trial." (Internal quotation marks omitted.) *Id.* Whether two verdicts are legally inconsistent is a question of law. *Id.* at 642. Accordingly, a trial court's order granting or denying a new trial based on a claim of legally inconsistent verdicts is subject to *de novo* review. *Id.*

¶ 123    Although the jury in this case erred as a matter of law by assigning different degrees of legal responsibility to OSF and Dr. Balagani, this error did not give rise to legally inconsistent verdicts requiring a new trial. In order to find OSF liable as Dr. Balagani's apparent agent, the jury was required to find that: (1) OSF held itself out as a provider of medical intensive care services; (2) Donald neither knew nor should have known that Dr. Balagani was not an employee

53

of OSF; and (3) Donald (or those responsible for his care) did not choose Dr. Balagani as a treater, but rather relied upon OSF to provide medical intensive care treatment and services. The jury could make each of those findings without allocating fault or liability between Dr. Balagani and OSF. In other words, the jury's judgment that OSF was liable for Dr. Balagani's negligence under agency principles did not "rest for its validity and support" on any particular allocation of responsibility or fault between Dr. Balagani and OSF. Rather, it rested entirely on the three findings listed above. Those findings were not contradicted by the jury's erroneous allocation of liability. The jury's erroneous allocation of fault between Dr. Balagani and OSF suggests that the jury did not understand the legal consequences of a finding of derivative or vicarious liability (*i.e.*, that a vicariously liable principle is legally responsible for *all* of the damages caused by its agent's negligence). That is not surprising, as this legal principle was not articulated in either the jury instructions or the verdict form.[5] However, the jury's erroneous allocation of responsibility does not contradict or otherwise undermine the jury's findings that Dr. Balagani was OSF's apparent agent and that OSF was therefore liable for Dr. Balagani's negligent acts and omissions.

¶ 124     A defendant is entitled to a new trial as to liability due to inconsistent verdicts only where the jury's basis for finding the defendant liable is contradicted by some other verdict or finding made by the jury. See, *e.g.*, *Wottowa Insurance Agency, Inc. v. Bock*, 104 Ill. 2d 311 (1984) (remanding for new trial where jury's verdict that corporate officers were personally liable for fraud in connection with the execution of a guarantee agreement was inconsistent with its verdict that the guarantee at issue was a corporate obligation and not a personal guarantee); *Action*

---

[5] The pre-printed verdict form given to the jury merely stated that "[a]ssuming that 100% represents the total combined responsibility of all persons or entities whose responsibility proximately caused the death of Donald R. McIntyre, we find the percentage of responsibility attributable to each as follows: a) Rajesh Balagani, D.O. __%  b) Ryschell Bolton, D.O __%  c) OSF Healthcare System, St. Francis Medical Center __%." The verdict form did not instruct the jurors not to allocate responsibility between Dr. Balagani and OSF if it found Dr. Balagani to be OSF's apparent agent and found no other basis for imposing liability on OSF. Neither party objected to the verdict form as written.

*Construction & Restoration, Inc. v. West Bend Mutual Insurance Co.*, 322 Ill. App. 3d 181 (2001) (remanding for new trial because jury's verdict that defendant insurance company had breached its contract with the plaintiff, which entailed a finding that the parties had reached a meeting of the minds and formed a contract, was inconsistent with its verdict that the defendant had committed common law fraud by concealing material fact from the plaintiff, which would have precluded a meeting of the minds and the formation of a contract). As noted above, this is not such a case. In this case, the found jury OSF liable under agency principles and then erroneously allocated fault for purposes of awarding damages. Such legal errors do not create irreconcilably inconsistent verdicts necessitating a new trial as to liability. See generally *Marek v. Stepkowski*, 241 Ill. App. 3d 862, 870-71 (1992) (rejecting defendants' argument that the jury's verdict was unclear where the jury had found the two defendants liable as joint tortfeasors and then erroneously attempted to allocate damages equally between them); *Mrowca v. Chicago Transit Authority*, 317 Ill. App. 3d 784, 785-88 (2000) (affirming trial court's denial of a new trial based on inconsistent verdicts despite the fact that the jury had improperly awarded the plaintiff damages after finding her 60% liable for the accident, in violation of section 2-1116 of the Code of Civil Procedure (735 ILCS 5/2-1116 (West 2000))).

¶ 125      In sum, the jury's error in allocating fault did not create an irreconcilable conflict with its liability verdict against OSF because the liability verdict did not depend upon any finding that is contradicted by the erroneous allocation of fault. Such an irreconcilable conflict would exist if the jury had found that OSF was vicariously liable for Dr. Balagani's negligence under agency principles while also finding that Dr. Balagani was not negligent. *Johnson v. Kirkpatrick*, 11 Ill. App. 2d 214, 216 (1956) (verdicts were inconsistent and new trial was required where jury found negligence on the part of a tractor's owner but none on the part of the driver, even though the

owner's liability was premised entirely on the driver's conduct under agency principles). An irreconcilable conflict would also arise if the jury had found OSF liable for Dr. Balagani's negligence under agency principles but also found that Dr. Balagani was not acting as OSF's agent. In each of these examples, the basis of the jury's finding of liability against OSF would be directly contradicted by other findings made by the jury. That is not the case here.

¶ 126    Nevertheless, we reverse the jury's erroneous allocation of damages and remand for a new trial to determine the proper allocation of fault and liability between Dr. Balagani/OSF and, if necessary, the Thomas defendants. We acknowledge that no party has asked us specifically to reverse the jury's allocation of liability.[6] A reviewing court normally should not search the record for unargued and unbriefed reasons to reverse the circuit court's judgment, especially when it would have the effect of transforming its role from jurist to advocate. *West Bend Mutual Insurance Co. v. TRRS Corp.*, 2019 IL App (2d) 180934, ¶ 30; *Marconi v. City of Joliet*, 2013 IL App (3d) 110865, ¶ 18. However, " 'a reviewing court does not lack authority to address unbriefed issues and may do so * * * when a clear and obvious error exists in the trial court proceedings.' " *Mid-Century Insurance Co. v. Founders Insurance Co.*, 404 Ill. App. 3d 961, 966, quoting *People v. Givens*, 237 Ill. 2d 311, 325 (2010); see also *Marconi*, 2013 IL App (3d) 110865, ¶ 18. Moreover, pursuant to Illinois Supreme Court Rule 366 (eff. Feb. 1, 1994), in exercising its responsibility for a just result, a reviewing court may decide a case on grounds not raised by the parties. *West Bend Mutual Insurance Co.*, 2019 IL App (2d) 180934, ¶ 30; *Marconi*, 2013 IL App (3d) 110865, ¶ 16. In this case, the jury clearly erred by allocating 70% of the fault to Dr. Balagani and 30% of the fault to OSF, even though it found that OSF's

_____

[6] Angela, the Balagani defendants, and OSF each requested a new trial on damages, which we have denied. OSF has also asked for a new trial on liability based upon the allegedly inconsistent verdicts. However, OSF argues that, if we deny OSF's requests for a new trial on liability and/or damages, we must uphold the jury's erroneous allocation of liability because no party has appealed that allocation.

liability was purely derivative and was predicated entirely upon Dr. Balagani's negligent conduct. By reversing the jury's erroneous allocation of fault between Dr. Balagani and OSF, we are not advocating for any party in this case, but simply correcting a clear and obvious error in the verdict that would otherwise produce a result that is contrary to well-established legal principles. OSF acknowledges that the jury's allocation of fault was error because fault may not be compared between a principle and agent, thereby precluding any allocation of liability between them.

¶ 127    Moreover, remanding for a new trial on the allocation of liability may be a practical necessity in this case. We have reversed the trial court's grant of summary judgment in favor of the Thomas defendants and remanded for a new trial to determine whether Dr. Thomas was negligent and liable in whole or part for Donald's death. If the jury finds Dr. Thomas liable for any portion of the $1.6. million in damages that the jury awarded to Angela, damages would need to be reallocated between Dr. Balagani/OSF and the Thomas defendants. Accordingly, we reverse the jury's allocation of fault and remand the matter for redetermination, which should occur after a judgment is entered as to the Thomas defendants' liability.

¶ 128    We have considered the other arguments raised by the parties on appeal and find that they lack merit.

¶ 129                                              CONCLUSION

¶ 130    For the foregoing reasons, the judgment of the circuit court of Peoria County is affirmed in part, reversed in part, and remanded with directions.

¶ 131    Affirmed in part, reversed in part, and remanded with directions.